**UNITED STATES of America, Petitioner-Appellee,**

v.

**GILA VALLEY IRRIGATION DISTRICT et al., Respondents-Appellants.**

**No. 25563.**

United States Court of Appeals, Ninth Circuit.

Jan. 19, 1972.

Robert O. Lesher (argued), of Lesher & Scruggs, Tucson, Ariz., Anderson & Welker, Safford, Ariz., for respondents-appellants.

Robert S. Lynch, Asst. U. S. Atty., (argued), R. S. Alleman, Asst. U. S. Atty., Richard K. Burke, U. S. Atty., Phoenix, Ariz., Robert Hurley (argued), of Jennings, Strouss & Salmon, Phoenix, Ariz., Gust, Rosenfeld & Divelbess, Phoenix, Ariz., Edmund B. Clerk, Martin Green, Robert S. Lynch, Dept. of Justice, Shiro Kashiwa, Asst. Atty. Gen., Lands

**220**

& Nat. Resources Division, Washington, D. C., for petitioner-appellee.

Before DUNIWAY, ELY and CHOY, Circuit Judges.

CHOY, Circuit Judge:

This is an appeal from a decree of the District Court declaring improper certain water-diversion practices of the Water Commissioner appointed by that court to administer its prior decree of June 29, 1935. We affirm.

The Gila River originates in Western New Mexico and flows in a general westerly direction across Arizona to its confluence with the Colorado River. The river's volume varies greatly during the year, and the region through which it flows is subject to cloudbursts and heavy floods. The rainy season is short, and the land through which the river flows is "semi-arid or desert . . . requiring irrigation for successful agricultural and horticultural use." Gila Valley Irrigation District v. United States, 118 F.2d 507, 508 (9th Cir., 1941).

In 1924, Congress authorized the construction of the Coolidge Dam across the river, creating the San Carlos Reservoir "for the purpose, first, of providing water for the irrigation of lands allotted to Pima Indians on the Gila River Reservation, Arizona, now without an adequate supply of water, and, second, for the irrigation of such other lands in public or private ownership, as in the opinion of the . . . Secretary [of the Interior], can be served . . . without diminishing the supply necessary for said Indian lands . . . ." Act of June 7, 1924, c. 288, 43 Stat. 475.

In 1925, the United States, on its own behalf and on the behalf of the Pima and Apache Indians (Lower Valleys Users), sued certain irrigation districts, canal companies, and individuals (Upper Valleys Users) whose lands, irrigated by the river's waters, lie above the Coolidge Dam, the San Carlos Reservoir, and the Indian lands, to determine their respective water rights. An elaborate consent decree was entered on June 29, 1935, establishing priorities to the river's water and providing for a water commissioner to administer and continuing district court jurisdiction to interpret the decree. The decree recognized that the rights of the Pimas below the reservoir were "immemorial," that is, prior to all others and that the rights of the Apaches above the reservoir were prior to all others, except the Pimas. The 1935 decree sets forth the full measure, extent, and limits of the rights of all the signatory parties and their successors in interest to divert and utilize the waters of the Gila River.

In 1965, the United States on behalf of the Pimas and the Apaches, joined by the San Carlos Irrigation and Drainage District, sued the Water Commissioner challenging as unauthorized by the decree three water-diversion practices which benefitted the Upper Valleys Users to the detriment of the Lower Valleys Users. The Upper Valleys Users intervened, and now appeal the District Court's ruling against them.

■ 1. Article VIII(2) of the 1935 decree allows the Upper Valleys Users to take "apportioned water" from the river, provided, that,

"[T]he drafts on the stream by the upper valleys defendants shall be limited to a seasonal year diversion which will result in an actual consumptive use from the stream of not to exceed 120,000 acre feet of water; . . . and the Water Commissioner shall determine what diversions are permissable [sic] and reduce diversions in the inverse order of their priorities when and to the extent necessary . . . ."

Consumptive use is calculated by first adding together the recorded flows at two upstream gauging stations and then subtracting the recorded flow at a downstream gauging station just above the reservoir. Both the Water Commissioner and the Upper Valleys Users contend that the latter's "apportioned water" under Article VIII(2) should not include their Article V "priority water:"

" . . . [E]ach owner is entitled . . . to divert from the

natural flow of the stream . . . a total amount of water not exceeding 6 acre feet per acre of said land . . ."

Since 1949, however, the Water Commissioner has subtracted diversions of this "priority water" by the Upper Valleys Users before determining if the 120,000 acre feet limit had been met.

However, it is clear from the decree that the 120,000 acre feet limit in Article VIII(2) is an absolute limit on the river water which the Upper Valleys Users may utilize. Article V establishes a maximum allowable *diversion* limit of 6 acre feet for each acre, for all landowners, both Upper and Lower Valleys Users. Article VIII(2), on the other hand, is more limited. First, it is specifically addressed to Upper Valleys Users and their rights. Second, it deals with consumptive use, not diversion. Consumptive use is limited to 120,000 acre feet; and while related to diversion, it differs from the in-and-out aspects of water diversion. Third, the express formula for consumptive use omits any mention of Article V "priority water." Finally, the entire decree was a compromise by which the Lower Valleys Users waived certain of their water priorities in favor of limited use by the Upper Valleys Users. The express mete of the waiver here is 120,000 acre feet, no more. The Water Commissioner had no authority to widen that waiver by introducing into the calculation Article V priority water.

2. The 1935 decree limits the rate of diversion by Upper Valleys Users to $\frac{1}{80}$ cubic foot per second per acre. However, an exception in Article V reads:

"The water commissioner . . . in order to take proper advantage of sudden freshets or other periods of more plentiful natural flow in the stream, may authorize and provide for, and as to the lands of defendants above the San Carlos Reservoir shall permit, when no injury will result to others not being so accommodated, diversions therefrom under said rights at a greater rate than $\frac{1}{80}$ of a cubic foot per second, but subject to the explicit condition that the total diversion for the lands involved shall not exceed during the irrigation season the said total of 6 acre feet per acre . . ."

The Water Commissioner implemented this exception whenever he determined, by visual inspection of the water level at certain points, that the water volume was larger than usual. He made no attempt to determine whether the priority rights of the Lower Valleys Users had been satisfied because in his view "when no injury will result to others not being accommodated" referred only to other Upper Valleys Users.

■ The Commissioner and the Upper Valleys Users assert that only the landowners above the dam and reservoir can be "so accommodated" by sudden increases in the river which occur above and are of little practical importance below the dam and storage reservoir. Thus, "other" must refer to the same group, the Upper Valleys Users. However, not all water which flows into the reservoir is stored there. The river, dam and reservoir are analogous to a river flowing through a natural lake. While part of the water entering the reservoir remains there, part flows downstream. *Gila Valley, supra,* at 509. This water flow may "accommodate" the Lower Valleys Users, who may benefit from the water from storms and flash floods which form part of the natural flow of the river, as much as the upstream users. We agree with the District Court that in accelerating the diversion of water, the Commissioner erred in ignoring the interests of Lower Valleys Users, which by the terms of the decree are prior to all others.

■ 3. Whenever, by visual investigation, the Commissioner determined that water would not reach the downstream users, he permitted the Upper Valleys Users to divert certain amounts which he designated "Immem.° " or "c." and listed as "priority diversions" which

he did not include in the calculation of consumptive use. The Upper Valleys Users concede that the 1935 decree contains no specific authorization for "Immem.° " and "c." priorities. However, they argue that to allow this water to continue down the river would result in wastage. First, there is no evidence that water will be wasted. Second, this practical position miscontrues what the District Court actually ordered. The court did not rule that the Commissioner could not conserve water by diverting it to Upper Valleys Users when there is a high probability of seepage or wastage. The court simply enjoined the diversion of water under the cover of the fictitious "Immem.° " and "c." priorities. The Commissioner was enjoined from "permitting water, *other than apportioned water*, to be diverted as against the water rights of plaintiffs *except* in strict accordance with the priority schedule set forth in Article V of the Decree." (emphasis supplied). The Commissioner may still divert water to the Upper Valleys Users, but that water, like all water used by the Upper Valleys Users, is chargeable against the 120,000 acre feet limit.

Affirmed.