UNITED STATES of America, Plaintiff,

and

Gila River Indian Community,
Plaintiff in Intervention,

and

San Carlos Apache Tribe, Plaintiff
in Intervention,

v.

GILA VALLEY IRRIGATION
DISTRICT, et al.,
Defendants.

GLOBE EQUITY No. 59 (JCC).

United States District Court,
D. Arizona.

Sept. 18, 1992.

Brent F. Moody, Ryley, Carlock & Applewhite, Phoenix, Ariz., Gila Water Com'r Co–Counsel Riney B. Salmon, II, Phoenix, Ariz., L. Anthony Fines, Stompoly & Stroud, P.C., Tucson, Ariz., Steven Carroll, F. Patrick Barry, Dept. of Justice Washington, D.C., Alfred S. Cox, Cox & Cox, Phoenix, Ariz., Pamela L. Vining, Vining & Martin, Phoenix, Ariz.

Joseph E. Clifford, Katherine L. Mead, Sandra Hafner Lee, Asst. Attys. Gen., Phoenix, Ariz., Robert B. Hoffman, Snell & Wilmer, Phoenix, Ariz., Michael R. Urman, DeConcini, McDonald, Brammer, Yetwin & Lacy, Phoenix, Ariz., James P. Watts, Stephens, Watts, Day & Brown, Phoenix, Ariz., Burton M. Apker, Apker, Apker, Haggard & Kurtz, P.C., Phoenix, Ariz., Thomas M. Murphy, Murphy, Goering, Roberts & Holt, P.C., Tucson, Ariz., Ralph E. Hunsaker, O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, Phoenix, Ariz., Kenyon Udall, Bryce & Udall, Safford, Ariz., Lauren J. Caster, Fennemore Craig, Phoenix, Ariz.

John A. Buttrick, Brown & Bain, Phoenix, Ariz., Michael A. Curtis, Steven B. Bennett, Phoenix, Ariz., Michael F. McNulty, Colleen Cacy, Streich, Lang, Weeks & Cardon, P.A., Tucson, Ariz., Marc G. Simon, Snell & Wilmer, Tucson, Ariz., Joe Sparks, John H. Ryley, Sparks & Siler, P.C., Scottsdale, Ariz., Terese Neu Richmond, Chief Counsel, Dept. of Water Resources, State of Ariz., Phoenix, Ariz., Katherine Miller, Office of the Field Sol., Phoenix, Ariz.

## FINAL MEMORANDUM AND ORDER

COUGHENOUR, District Judge, sitting by designation.

### I. Background

This phase of *United States, et al. v. Gila Valley Irrigation District, et al.,* Globe Equity No. 59, (hereafter "Globe Equity") concerns the enforcement of the Globe Equity Consent Decree of June 29, 1935, (hereafter "Decree") for the benefit of the Gila River Indian Community and the San Carlos Apache Tribe. The Court held trial November 12–22, 1991, and heard closing arguments February 24 and 25, 1992. The parties presented evidence and argument related to Counts I–V of the San Carlos Apache Tribe's Complaint in Intervention, and Counts IX–XII of the Gila River Indian Community's Complaint in Intervention.

Briefing has been submitted by the San Carlos Apache Tribe (hereafter "Apache Tribe"), the Gila River Indian Community (hereafter "GRIC" or "Indian Community"), the United States, the San Carlos Irrigation and Drainage District (SCIDD), the State of Arizona, the Upper Valley Defendants (hereafter "UVDs" or "Upper Valleys"), and the Gila River Water Commissioner. The UVDs include the Gila Valley Irrigation District, the Franklin Irrigation District, all of the canal companies diverting water from the Gila river in the upper valleys (Safford and Duncan–Virden) and all of the landowners and water users in the upper valleys with rights to Gila River water, as set out in the Decree.

This memorandum and order analyzes the issues currently before the Court, and expresses the Court's final orders on these issues. An opinion, to be published, will follow this memorandum and order.

### II. Facts

The Gila River flows in New Mexico and Arizona, ultimately joining the Colorado River in its journey to the Gulf of California. The river travels through farmlands in the Duncan–Virden valley, the Safford valley, and then through the San Carlos Apache Reservation. Coolidge Dam holds the waters of the Gila in the San Carlos Reservoir, and allows the water to pass down the channel to Ashurst–Hayden Dam. At Ashurst–Hayden, the waters of the Gila

**4**

are diverted by the San Carlos Indian Irrigation Project (SCIIP) for use on the lands of the Gila River Indian Reservation, on the lands of the San Carlos Irrigation and Drainage District (SCIDD), and the lands of the Florence–Casa Grande Project not within SCIIP.

Because there is greater demand for water than the Gila River can supply, the many people who hope to benefit from the river have periodically returned to this forum to resolve their disputed claims on the river. The rights of the various claimants to the Gila have been thoroughly, albeit confusingly, described in the 1935 Consent Decree, which this Court must interpret to determine these conflicting claims.

This phase of Globe Equity, due to the intervention of the San Carlos Apache Tribe, invites the Court to consider the historical context as it relates to the Apaches. The UVDs have strenuously argued that the situation of the Tribe is not relevant to the interpretation of the Decree. True, the Decree itself makes no mention of the circumstances of the Tribe. However, to overlook the conditions prevailing on the Reservation would seem to this Court to be yet another instance of the manifest injustice which has assailed the Tribe at virtually every turn since their dealings with the United States and its citizens began. History and present conditions should play some role in the analysis of the Decree. Just as the Court considers the generations of farmers in the Upper Valleys, so will it consider the continual derogation of the Tribe's rights to the Gila river. To approach this case from a less informed perspective would be inappropriate.

To say that the Tribe is poor is to severely understate the plight of the Apaches. The infant mortality rate is seven times the national average. Tr., Nov. 18, 1991, at 90 (Testimony of Raleigh Thompson). Malnutrition abounds. Housing varies from inadequate to non-existent, as does running water and electricity. *Id.* at 75–77. Unemployment is not just rampant, it is the rule; the exceptions are the two in ten Apaches who have work. *Id.* at 62–63.

The situation of the Tribe owes allegiance in large part to the history of the reservation system, and the particular oppression for which the Apaches were singled out. Rather than belabor this point, more eloquently made by scholars and the Apaches themselves, the Court makes note of just one example—the life of Eskiminzin, the Aravaipa leader who time after time made his peace with the U.S. government, only to suffer the massacre of his family and people, the placement of his people on semi-arid land considered a wasteland by Arizonans, and the destruction of his own farm on the San Pedro. *See,* Sinclair Browning, *Enju: The Life and Struggle of an Apache Chief from the Little Running Water* (1982). Ultimately, Eskiminzin was jailed indefinitely in Alabama, on the suspicion of harboring a fugitive. His life was a testament to the patience of the Apaches, their dedication to family and self-determination. The miracle, if there be any, of the relationship between the U.S. government and these sovereign nations is that the spirit of the Apaches has not been extinguished.

Today, the Apaches, like other claimants under the Decree, ask for what they were promised by our ancestors—the right to farm their lands on the Gila River. The testimony of members of the Tribe indicates that the Apaches have farmed, and will continue to farm their land if given the opportunity.

III. Statement of Issues

This phase of Globe Equity presents the Court with the following issues:

(1) The extent of the Apache Tribe's rights to the flow of the Gila River;

(2) "Carryovers" of apportionments from one year to the next;

(3) The 30,000 acre-feet reserve for a fishery in the San Carlos Reservoir;

(4) Water transfer procedures;

(5) "Storage" of water in the Reservoir, and "1924(b)" apportionments of stored water;

(6) Diversions for lands not "then being irrigated," and stacking of water for lands not being irrigated; and

(7) Diversions of water in excess of 1/80th cubic-foot per second (cfs).

Certain of these issues are resolved with finality here. Others, as a result of the parties' agreement to form a Rulemaking Committee, will be deferred. The Rules Committee shall consist of representatives from the United States, the Gila River Indian Community, the San Carlos Apache Tribe, the Upper Valley Defendants, the San Carlos Irrigation and Drainage District, and the Water Commissioner. *See,* Pretrial Order at 18. The Rules Committee shall suggest to the Court various rules and regulations regarding certain provisions of the Decree. The Committee is not empowered to modify the Decree or any order of the Court. The parties to the Decree retain the right to object to proposed rules, and to argue that no rules or regulations are necessary with respect to any provision of the Decree. The Committee, according to the agreement represented in the Pretrial Order, shall have six months from the date of its formation to submit agreed-upon proposed rules, and alternative proposed rules. Each party will then have thirty days to comment on rules, recommendations, and alternatives. After the comment period has expired, the Court may adopt proposed rules and regulations, to the extent that the Court finds that they do not constitute modifications of the Decree or court orders.

The parties have agreed that the Rules Committee will address (1) the sudden freshets clause of Article V, (2) discontinuation of diversions for violations, (3) the measuring device clause of Article XII, (4) the role of the Water Commissioner in interpretation of Article VIII(4), (5) the adoption of a "call" system for administration of Article V, and (6) procedures for adopting rules after approval or rejection by the Court. Other issues may be considered by the Rules Committee, either at the direction of the Court in this Order and its oral orders, or upon approval of a request to submit an issue to the Committee.

## IV. The Apache Tribe's Rights to the Flow of the Gila River

The Apache Tribe, in Count One of its complaint in intervention, seeks to establish that, under the Decree, the Tribe's rights are superior to any decreed rights in the upper valleys, and that UVDs therefore may not divert on priority or apportionment any of the waters of the Gila river unless and until the Apache Tribe has exercised its first and prior right to divert 6,000 acre-feet from the river. The Apache Tribe also requested the Court fashion other relief, such as adopting a River Management System that will enable the Tribe to divert and irrigate with water from the natural flow of the Gila River. During closing arguments, however, the Tribe indicated a desire to defer the decision on the River Management System until a later date.

### A. *Superiority of the Apache Tribe's Rights*

Article VI(2) of the 1935 Decree provides that the United States owns

*The right,* on behalf of the Apache and other Indians of the San Carlos Indian Reservation, their descendants, successors and assigns, *to divert 6,000 acre feet of the waters of the Gila River, during each irrigation season, from the natural flow in said river at diversion points on said river within said reservation* —or above the eastern boundary thereof under such rights of way as may now exist or be acquired therefor; due measures being taken to avoid injuries to other water users by said last mentioned diversions,—*as of a date of priority of the year 1846* and to the extent that such waters are available under said priority—*at a rate of diversion not exceeding 12.5 cubic feet per second* at any time during such season, *for the reclamation and irrigation of 1000 acres* of the irrigable lands within the said reservation (or in part or wholly within the valley of the Gila River above the eastern boundary of said Reservation, if lands are there acquired by the United States for that purpose), situated in the County of Graham, State of Arizona, and more particularly described as within said reservation that portion of the valley of the Gila River

above the San Carlos Reservoir and flow line thereof; ...

(Emphasis added.) Under this clause of the Decree, the Apache Tribe (or, more exactly, the United States, on behalf of the Apache Tribe) has a right to divert 6,000 acre-feet to irrigate 1,000 acres, with a priority date of 1846. The parties do not appear to dispute that, as to priority waters, the Tribe's right must be satisfied before the UVDs may assert their rights to priority water, because no UVD has a right prior to the Tribe's. However, the parties dispute the effect of upper valley apportionments on the Tribe's right to priority water. First, the Tribe argues that UVDs have admitted that their 1846 priority is superior to any of the UVDs rights to divert either under priority or apportionments. The UVDs' responses to requests for admissions do not clearly concede that UVDs may not divert apportionment water if the Tribe's prior rights are not satisfied. *See, Trial Brief of San Carlos Apache Tribe* (hereafter, Apache Tribe's Trial Brief), at 6–7 (quoting the Tribe's requests for admission). The Tribe also argues that, based on the testimony of George Greiner and Jon Allred, the Court may conclude that the Tribe's rights are superior in every respect. *See,* Deposition of George Greiner, at 18 (March 27–28, 1991); Testimony of Jon Allred, Tr. at 9, 11, 29, 63 (Nov. 14, 1991).

The testimony of the water commissioner and his assistant does not control the interpretation of the Decree, however. UVDs argue that the Tribe's right is not superior to UVDs' rights to take apportioned water. Their reasoning is as follows: Article VIII of the Decree gives the UVDs the right to take apportioned water "in disregard of" the United States' immemorial priority right on behalf of the GRIC when water is stored in the San Carlos reservoir; thus, if there is insufficient water in the river to satisfy both the apportionment rights of the UVDs and the priority rights for lands on the Gila River Indian Reservation, the United States may not divert on priority to the San Carlos Apache Tribe. This argument, while it may be stated in a way that appears to be sensible, is the product of tortured logic. First, the Decree expressly provides that apportionments are made "in disregard of" the rights of the United States *below* the reservoir. The Decree states:

That on the first day of January of each Calendar year, or as soon thereafter as there is water stored in the San Carlos Reservoir, which is available for release through the gates of the Coolidge Dam for conveyance down the channel of the Gila River and *for diversion and use on the lands of the San Carlos Project* for the irrigation thereof, then the Water Commissioner, provided for herein, shall, to the extent and within the limitations hereinafter stated, apportion for the ensuing irrigation year to said defendants from the natural flow of the Gila River an amount of water equal to the above described available storage, and shall permit the diversion of said amount of water from said stream into the canals of said defendants for the irrigation of said upper valleys lands *in disregard of the aforesaid prior rights of plaintiff used on lands below said reservoir;* ...

Decree, Article VIII(2) (emphasis added). Under this provision, the UVDs' apportionment rights are "in disregard of" only the United States' immemorial right on behalf of the GRIC. That GRIC's rights may be held in derogation of the UVDs' rights does not imply that the Apache's right may be similarly derogated, simply because it is junior to GRIC's right. The UVDs' argument is also at odds with the apparent intent of the Decree, which is to ensure that the UVDs can divert water when there is, in fact, water in the Reservoir to satisfy the needs of the lower valley users. Apportionments of water are linked with storage in the Reservoir. The United States cannot, under the Decree, store water for the benefit of the Apache Tribe. Therefore, to read the Decree in such a way that allows the UVDs to satisfy their requirements through apportionments, at the expense of the Apaches' priority right, effectively eliminates the benefit of the Apaches' 1846 priority altogether.

Accordingly, the Court finds that the Apache Tribe's prior right to 6,000 acre-feet of water from the flow of the Gila River is superior in all respects to the rights of the UVDs to the flow of the river. If, at any time, the Apache Tribe asserts its prior right to the natural flow of the Gila River, UVDs may not divert water either on priority or apportionment.

## B. *Other Relief Requested Under the 1846 Priority*

The Apache Tribe also requests that the Court, in fashioning relief under Count I, hold that (1) the UVDs cannot divert the entire flow of the river, (2) the Tribe is entitled to more than 12.5 cfs, and (3) the Tribe is entitled to a live stream. Further, the Tribe requests that the Court adopt or approve the gravity flow diversion system proposed by Stetson Engineers in its report. *See,* Stetson Engineers, Inc., *Preliminary Review of the Technical Aspects of The Globe Equity No. 59 Case, Gila Decree, for the U.S. Department of Justice: San Carlos Apache Tribe Complaint in Intervention* (Nov. 5, 1991) (hereafter "Stetson Irrigation Report").

### 1. Diversion of Entire Flow

The Tribe argues that the UVDs should not be allowed to divert the entire flow of the river, because the water is degraded when it returns to the stream bed as irrigation "return flows." The Tribe relies on the Article VI(2) language of the Decree which codifies their right to the "natural flow" of the river, arguing that return flows are not natural flow.

The Court notes at the outset that this is primarily a water quality issue, and that even the Apache Tribe suggests that certain action should wait for the next phase of this litigation. *See,* Post Trial Brief of the San Carlos Apache Tribe, at 29 (hereafter Apache Tribe's Post–Trial Brief). Therefore, determination of the quality of water to which the Tribe and other downstream users are entitled shall be deferred. However, the Court agrees with the Tribe that "natural flow" is not the same as irrigation return flows. The testimony at trial unequivocally indicates that return flows are inferior and higher in salts. Tr. Nov 14, 1991, at 48–49 (Testimony of Jon Allred). Because the Tribe is entitled to 6,000 acre-feet of natural flow, UVDs should be prevented from diverting the *entire* flow of the Gila River when the Tribe is exercising its prior rights. To the extent that the Tribe asserts is prior right to flow in the upper valleys, the amount called for must be allowed to pass undiverted; to the extent that the Tribe does not exercise its prior right, or at such time as the prior right has been exhausted, UVDs may divert the entire flow, subject to any other limitations imposed by the Decree or the Court's orders.

The Court considers this analysis of the natural flow issue to be preliminary. If, during the next phase of the litigation, the Court is persuaded that UVDs may divert the entire flow of the stream without compromising the Tribe's right to natural flow, or without degrading the water to any greater extent than if some portion of it went undiverted, the Court will modify this aspect of the order in accordance with the evidence.

### 2. Flow Exceeding 12.5 cfs on San Carlos Reservation

■ The Tribe argues that it is entitled to a flow greater than 12.5 cfs to ensure (1) that it has sufficient hydraulic "head" to push 12.5 cfs past a Parshall flume on a diversion ditch, and (2) that it has the full 12.5 cfs for irrigation after the water passes through two earthen canals. The question of flow rates is tied to several related questions about what type of diversion system the Tribe may install to take advantage of its rights under the Decree. The issues and arguments are summarized below.

The Tribe urges the Court to approve the Stetson proposal, which consists of two unlined earthen canals diverting water to farms on either side of the river near Bylas. *See,* Stetson Irrigation Report, at 8–10 and Plate 2. The canals total approximately 7.5 miles, and will lose water to evaporation and seepage at the rate of about 1 cfs per mile. The Tribe prefers unlined earthen channels because they (1) create no

electric or maintenance overhead for the Tribe, unlike the french drains, pumps, or gallery systems, (2) are inexpensive to build, and easy to rebuild after a flood, and (3) are consistent with the Decree, which provides the Tribe with access to the "natural flow" of the river for irrigation. The Tribe states that it will require up to about 30 cfs to ensure that it can adequately irrigate on both sides of the river during the peak irrigation season of July and August.[1]

The UVDs argue that, although the gravity diversion system is permitted under the Decree, other systems are permitted as well, and the Tribe should be required to use a system that is more cost-effective and efficient. UVDs assert that as no plan has yet been approved by the BIA or funded by the government, the Court would be in the position of rendering an advisory opinion if it approved the Stetson proposal. UVDs also argue that the U.S. should exercise its rights to acquire water rights east of the reservation boundary, since the river nearly always flows at certain points beyond the reservation. At a minimum, UVDs argue, the Tribe should be required to use lined canals (which cost $6–8 per foot), to install Parshall flumes near the head of the channels, and should not be allowed to take a total flow of 30 cfs based on the need to irrigate more than once every two weeks in peak season. Finally, UVDs argue that the Court should direct the water commissioner to approve a new diversion system on the reservation.

*Method of diversion:* The Decree allows for diversions by ditches (gravity flow) and pumps. Decree, Article V. It also permits the United States to acquire rights beyond the eastern boundary of the reservation to provide water for irrigation on the reservation. Decree, Article VI(2). But it does not require any one method, nor does it impose a reasonableness standard. The Tribe can no more be ordered to use a cost-effective or efficient method of diversion than the UVDs. Furthermore, what may appear cost-effective to the upper valley farmers may be simply beyond the financial reach of the Tribe. Therefore, the Court rejects the arguments that the Tribe is required to install pumps or drains instead of canals, or to line its canals (which the UVDs do not generally do), or that the U.S. is required to acquire rights above the boundary.

Similarly, the Court cannot conclude that the water commissioner should be empowered to approve any new diversion system on the river. The UVDs have not been subjected to any requirement that the commissioner approve their diversion mechanisms, and the Decree offers no authority for the commissioner to do so.

■ *Conveyance Losses:* The Decree requires that users be charged with "all conveyance losses from the point of diversion from the stream to the lands" irrigated. Decree, Article V. It further provides that measuring devices are to be installed "at or near the head" of the ditch. Decree, Article XII. Under these two provisions, it is apparent that the drafters of the Decree intended that measuring devices be installed close to the stream, and that the amount diverted beyond the measuring device not include any additional amounts to account for transportation losses below the measuring device. To the extent that measuring devices are not placed at the head of the ditches, the Decree apparently intends that conveyance losses shall nevertheless be charged to the user.

The water commissioner has not historically charged users with conveyance losses occurring between the diversion point and the measuring device. Tr. Nov. 14, 1991,

---

1. The total amount of water necessary for effective irrigation under the Stetson plan takes into consideration (1) the Tribe's asserted need to irrigate on both sides of the river at once (with 6.25 cfs on each side, beyond the Parshall flume); (2) an additional amount in each channel to "wheel" the water to the flume, and (3) an amount of water representing what will be lost in transporting the flow in the channels. The Stetson Irrigation Report therefore estimates that a total of about 30 cfs would be required at peak irrigation times: on one side, 6.25 cfs for irrigation, plus 4.75 cfs to wheel the water to the flume, plus 4 cfs transportation losses, for a total of 15 cfs; and on the other side, 6.25 cfs, plus 5.25 to wheel the water, plus 3.5 cfs for transportation losses, for a total of 15 cfs.

at 15 (Testimony of Jon Allred). Under the Stetson proposal, the Tribe's Parshall flumes would be installed 3.5 and 4 miles downstream of the diversion points, so that conveyance losses would not be charged against the Tribe. This approach is not dissimilar from the approach taken in the upper valleys; however, nowhere in the upper valleys is there a channel longer than 1.7 miles above the measuring device. *See, e.g.,* Tr. Nov. 14, 1991, at 11 (Testimony of Jon Allred).

The UVDs argue the Tribe should be required to measure at the heads of their ditches because (1) in the upper valleys, seepage losses eventually return to the stream, so the Tribe isn't harmed by the failure of UVDs to measure at the heads of their ditches, (2) the soils in the upper valleys are compacted, so there is less seepage than on the reservation, and (3) the canals in the upper valleys are narrow and free from phreatophytes. The underlying argument here is that seepage losses in the Tribe's canals will hurt the UVDs, because nature will not return that water upstream to them, whereas seepage losses in the upper valleys theoretically return to the river and flow down to the reservation.

The Tribe argues that it is not feasible to place the measuring device at the head of the ditch, as it may be damaged or destroyed by occasional flood flows. Further, the Tribe argues that it would be unfair to charge it with conveyance losses when similarly situated UVDs are not charged with them. It also appears from the evidence that the Tribe is at a significant disadvantage, because the gradient is shallower on its lands than in the upper valleys, thus requiring longer diversion channels to bring water from a point upstream of the lands to be irrigated, and because their soils are less compacted and more prone to seepage losses.

The Court sees no advantage in requiring the Tribe to place its measuring devices any nearer the heads of their ditches than such devices are placed in the upper valleys. The Court concludes that the Tribe shall be required to place its measuring devices, should it install any, at a point that is a safe distance from the head of the ditch, such that the device is less likely to be washed out in a flood. The Court directs the Rules Committee to consider the proper safe placement of measuring devices in the proposed canals, should the Tribe decide to construct them. Further, the Court concludes that the Tribe should be subjected to a standard no different from the other users. In the interest of compliance with the Decree, the Court directs the Rules Committee to consider and recommend a proposal for charging *all* users with conveyance losses in their canals between the points of diversion and the measuring devices.

*Flow for adequate head:* UVDs argue that no additional flow is required for "head" to push the total diversion allowance past the Parshall flume. This is incorrect. Both Ali Shahroody and Marvin Larson testified that a constant head is needed to maintain an accurate reading on the flume. Tr., Nov. 20, at 18, Nov. 21, at 101. The exact amount of head required for the Tribe's proposed system is unclear, and will depend, in part, on the type of diversion system the Tribe develops. There being no diversion system in place yet, the Court is not in a position to enter any finding as to an appropriate amount of additional flow for adequate head. The Court does conclude, however, based on the evidence regarding irrigation practices in the upper valleys, that additional flow for such head must be provided to give meaning to the Decree's provisions regarding the amount of water any party is entitled to for irrigation purposes.

*Lining:* As noted above UVDs argue that the Tribe should be forced to install lined channels, if they use channels at all. The evidence indicates that lining the channels would cost $6–8 per foot. Tr. Nov. 21, 1991, at 82 (Testimony of Marvin Larson). There is no provision in the Decree stating that canals must be lined, or must be of the most efficient design. The Court cannot construe the Decree as requiring that the Tribe employ any particular method of diversion, or that its canals be lined.

### 3. Live Stream Condition

The Tribe argues that it is entitled to a live stream condition in the Gila River year-round. In its Post–Trial Brief, the Tribe states that a live stream condition "was proposed (1) to meet the water quantity diversion requirements of the Apache Tribe; and (2) to meet water quality requirements." Apache Tribe's Post–Trial Brief, at 26. The Tribe then suggests that the court should defer the issue until water quality issues are ripe. In closing arguments, however, the Tribe argued that a live stream condition should be maintained under the "beneficial use" doctrine. The Tribe provided substantial evidence that the Gila River formerly ran on the reservation throughout the year, and that the river was important to the Tribe for economic, recreational, medical, and religious purposes.

To the extent that the Tribe argues that a live stream condition is mandated under the doctrine of beneficial use, the Court must disagree. While Article XI limits diversions from the river to those which are of beneficial use, Article XII specifically enjoins parties with decreed water rights from "asserting or claiming ... any right, title, or interest in or to the waters of the Gila River...." The Court agrees with UVDs that the Decree was intended as a complete statement of the rights of the various parties to the waters of the Gila River. The Court agrees with the Tribe that the drafters lacked both foresight and concerns for the interests of the Apaches living on and near the river. However, the Court is constrained by the Decree to conclude that, for purposes of uses not specified in the Decree, the Tribe can assert no right to a live stream condition.

### V. "Carryover" of Apportionments

The Apache Tribe alleges that the Water Commissioner improperly apportions water to the UVDs. This is the "carryover" dispute: if, on January 1 of any year, there is water stored in the reservoir, the commissioner uses it as a basis for an apportionment to the UVDs, even though the water was stored from the previous year, and was the basis for an apportionment in that year. Two provisions of the Decree are relevant. First, Article VIII(2) provides

> That on the first day of January of each Calendar year, or as soon thereafter as there is water stored in the San Carlos Reservoir, ... then the Water Commissioner ... shall, to the extent and within the limitations hereinafter stated, apportion for the ensuing irrigation year to said defendants from the natural flow of the Gila River an amount of water equal to the above described available storage
>
> ...

This clause describes the January 1 apportionment process. Article VIII(2) goes on to provide that "no apportionment or apportionments, made during any calendar year, shall carry over or be available in any manner for the succeeding year." This clause prohibits carryovers of apportionments. The Apaches argue that the reapportionments made based on the stored water from the previous year violate the prohibition on carryovers, and that the reapportionments allow the UVDs to divert twice the amount of water that has actually been stored in the Reservoir. The Court agrees with the Apaches that the reapportionments allow the UVDs to take twice. But this appears to be what the Decree intends.

The Decree specifically states that the January 1 apportionment is to be based on water stored in the reservoir on that date. If the drafters intended to exclude water that had been stored prior to December 31, and had been the basis of supplemental apportionments during the year, they could have so provided. The carryover clause should not be read in such a way that it overrides the January 1 apportionment clause. Rather, the carryover provision seems only to ensure that an unused apportionment cannot be taken the following year. Thus, suppose that 50,000 acre-feet of water entered the reservoir and was stored in mid-December of Year 1, and the water commissioner declared an apportionment of that water, relying on the supplemental apportionments clause of Article VIII, but the UVDs did not divert any

amount of the apportioned water before December 31. That apportionment would then vanish; it would not carry over into Year 2 for diversion. This is the effect of the carryover clause. However, if on January 1 of Year 2, the 50,000 acre-feet were still in the reservoir, it would be used as the basis for the January 1 apportionment. This is the effect of the January 1 apportionment clause. Thus, *apportionments* do not carry over; stored water that remains in the reservoir, however, may be used as the basis of an apportionment in both Year 1 and Year 2.

Put another way, the Decree does not expressly limit all apportionments to net accessions to the reservoir. There are two types of apportionments: those made on January 1 of each year, which are always based on the amount of water stored on that date, and those made during the year under the supplemental apportionments clause, which provides

that if and when at any time or from time to time in any year, water shall flow into said reservoir after said date of first apportionment and shall be stored there and become added to the available stored water in said reservoir, the said commissioner shall make further and additional apportionments to said defendants of the natural flow of said stream as the same is available at the diversion points of said defendants, which said apportionments shall in turn correspond with and be equivalent in quantity to the amount of such accessions or newly available stored water supply ...

Decree, Article VIII(2). Supplemental apportionments are tied to accessions to the reservoir. January 1 apportionments are not. That this results in some benefit to the UVDs is not surprising, nor is it contrary to the intent of the Decree. The Court therefore concludes that January 1 apportionments, based on the amount of water stored in the reservoir, do not violate the carryover clause of Article VIII.

## VI. The 30,000 Acre-foot Fish Pond

In 1990, the San Carlos Irrigation Project received 30,000 acre feet of water from the Central Arizona Project in lieu of releasing that amount of water from the San Carlos Reservoir. The exchange was pursuant to Congressional authorization, and intended to avoid a massive fish kill in San Carlos Lake. *See*, Public Law 101–301, 104 Stat 206, Act of May 24, 1990.

At closing argument, the parties appeared to have reached agreement that (1) the San Carlos Apache Tribe should be permitted to maintain a fishery, and that the 30,000 acre-foot reserve should be retained for that purpose, (2) that the 30,000 acre-feet would not be considered as a basis for apportionments to UVDs, and (3) that an accurate determination of seepage and evaporation losses had yet to be made. It further appears that there may remain some dispute as to whether the 30,000 acre-feet would be treated as at the top of the reservoir, and hence the first water to spill, or at the bottom of the water available for release. Because these issues have not been adequately briefed, and because it appears that the parties are close to agreement in their negotiations, the Court directs the Rules Committee to address this issue, and make recommendations on (1) how evaporation and seepage should be charged if the fish pond is maintained, (2) whether any further study of evaporation and seepage is required to, for example, apprise the water commissioner of how these should be charged, and to whom, and (3) whether the fish pond reserve should be considered the first or last to spill when there is a release from the Coolidge Dam.

## VII. Water Transfers

The parties dispute what method the Court should adopt to effect transfer of water rights. The Decree makes no express provision for transfers, but rather provides generally

that any of the parties to whom rights to water have been decreed herein shall be entitled, in accord with applicable laws and legal principles, to change the point of diversion and the places, means, manner or purpose of the use of the waters to which they are so entitled or any part thereof, so far as they may do so without

injury to the rights of other parties as the same are defined herein.

Decree, Article XI. The Apache Tribe has proposed a scheme under which transfers would be adjudicated by this Court, applying substantive law of Arizona and New Mexico. Should the Court reject this scheme, the Tribe requests that the procedure adopted be one which includes the right to appeal to this Court. Both UVDs and the State of Arizona argue that the Court should adopt Arizona's procedure in its entirety, which generally allows water transfers within districts upon approval of the district governing body. *See*, Ariz.Rev. Stat. § 45–172. The statute makes no provisions relevant to the larger type of network involved in the Decree. However, the UVDs and the State argue that it would be too burdensome to require parties to notify all parties connected to the suit for each water transfer.

Because the Decree involves water use issues not considered in Arizona's water transfer provisions, and because the Decree contains provisions which preempt state law, the Court concludes that Arizona's procedure should not be adopted as the sole means for conducting water transfers. The Court agrees with the State and UVDs that Arizona's provisions, in general, are consistent with the Decree. However, Arizona's scheme should be amended for use here to include (1) that notice must be provided to the water districts, the SCAT, the GRIC, the United States, the State of Arizona, the water commissioner, and this Court, and (2) that this Court retains jurisdiction over water transfers to the extent that they may violate the terms of the Decree. Any method for transferring rights governed by the Decree must include a means for a party who believes his or her rights are adversely affected by the transfer to seek review in this Court. The Court therefore directs the Rules Committee to prepare and submit proposed rules for transferring water which are substantially similar to the Arizona water transfer statute, but which provide for adequate notice to representatives of the parties of the Decree and for summary review in this Court.

## VIII. The 1924(b) Priority and "Storage"

■ The GRIC challenges the water commissioner's practice of declaring certain days "1924(b) priority" days. The Indian Community also challenges the water commissioner's practice of treating as "stored" water that downstream users are attempting to allow to flow through the reservoir. These two issues are distinct, but closely interrelated, such that they are best considered together.

The Water Commissioner employs an accounting practice known to the parties as "1924(b) priority." This practice began in 1939, at the request of the Gila Valley Irrigation District. Letter from Spencer Kimball, Secretary of Gila Valley Irrigation District, to Charles Firth, Gila Water Commissioner, March 9, 1939 (Stetson Engineers, Inc., *Preliminary Review of the Technical Aspects of The Globe Equity No. 59 Case, Gila Decree, for the U.S. Department of Justice: Gila River Indian community Complaint in Intervention Counts Nine through Twelve* (Nov. 5, 1991) (hereafter "Stetson GRIC Report"), Appendix A–1). Under the 1924(b) practice, the Water Commissioner retroactively declares diversions in the upper valleys as priority diversions if, on the same day, the level of the San Carlos Reservoir was either rising or static. Testimony of Jon Allred, Tr. Nov. 14, 1991, at 91. The general theory behind the 1924(b) priority is that it ensures that UVDs can exercise priority rights to water when the United States is storing water in the reservoir under its 1924 priority. Essentially all of the downstream users have objected to this practice since its inception, as is evidenced by letters to and from the water commissioner in the 1940's and 1950's.

The 1924(b) priority has been explained as an innocuous procedure. The United States has a priority right as of June 7, 1924, to store water in the San Carlos Reservoir. Almost all UVDs have rights prior to 1924. These UVDs are entitled to take their priority share before the United States can exercise its right to store water. However, the United States also has an

immemorial right, for lands on the Gila River Indian Reservation, to 210,000 acre feet. UVDs must let this water pass if the United States wants it. Because the commissioner never instituted a "call" system for determining whether the U.S. intended to exercise its prior call on the natural flow, he instead invented 1924(b) priority: if the level of the reservoir is rising or static, the commissioner presumes this is because the U.S. has chosen not to exercise its immemorial right, and is storing water at a 1924 priority. Therefore, he concludes that water diverted by the upstream users on that day was based on their 1924 and earlier priorities.

 There are so many problems with the 1924(b) priority it is difficult to list them all. First, there is no provision for it in the Decree. The Decree provides two methods for UVDs to divert water. They may divert based on their priority rights under Article V, or based on their apportionments under Article VIII. A party's priority right allows that person to make a "first and prior call" to the extent of that right as against all junior appropriators. The right is expressed as a "call" because an upstream junior appropriator is entitled to use a downstream senior appropriator's share of the water if the downstream user fails to indicate he or she wants it. *Cook v. Hudson,* 110 Mont. 263, 272, 103 P.2d 137, 146 (1940); *Worley v. United States Borax and Chemical Corp.,* 78 N.M. 112, 428 P.2d 651 (1967). The UVDs may also divert on apportionments. When there is water stored in the San Carlos Reservoir, Article VIII(2) directs the water commissioner to apportion an equivalent amount to the UVDs, in disregard of the United States' prior rights below the reservoir. When water is apportioned to UVDs, they may divert on these apportionments. When the apportionments are exhausted, or cannot be made due to lack of available storage, UVDs must revert to diverting only on priority. Decree, Article VIII(5). Nowhere in the Decree is there any indication that the water commissioner may retroactively declare that diversions were on a 1924(b) priority which is not denominated in Article V.

Second, 1924(b) priority effectively assures UVDs more than the amount of water provided for them in the Decree on any day the 1924(b) priority is declared. If, on any given day, the water commissioner concludes the United States is storing water because the level of the reservoir is rising, he declares that day a 1924(b) day, and accounts for all the diversions in the upper valleys that day as being 1924(b) priority. The commissioner goes on, then, to use the water stored in the reservoir that day as the basis for a supplemental apportionment. *See,* Deposition of Jon Allred, October 11, 1991, at 40–42; Tr. Nov. 14, 1991, at 23–27. The second taking of water caused by the 1924(b) priority is not set out in the Decree.

Third, the 1924(b) priority is inconsistently declared. As painstakingly documented in the Gookin Report (Gookin Engineers, *A Report Concerning United States of America and Gila River Indian Community v. Gila Valley Irrigation District: Counts Nine, Ten, Eleven, and Twelve, Globe Equity Number 59* (October, 1991)), 1924(b) priority days have been declared during the last 20 years on days of every possible combination of rising, static, and falling water in the reservoir, and inflows being greater than, equal to, or less than outflows. *Id.* at 11.34–11.36. Even under the more conservative assessments of the United States, 1924(b) priorities have been declared on dates when the reservoir was actually falling, because the commissioner rounded United States Geological Survey data in such a way that this fact was obscured. Stetson GRIC Report, at 33. The United States also points out that the 1924(b) priorities were declared on days when the measured rise in the reservoir was artificial, caused by wind action piling the water against the measuring devices. Stetson GRIC Report, at 31–32.

 Fourth, as GRIC argues, the 1924(b) priority declaration allows the UVDs to take advantage of water that, for any of several reasons, they were never entitled to. Under Article V of the Decree, a party may exercise his or her priority

right "at the point of diversion ..." A party is not entitled to water which, for example, enters the river below his or her point of diversion, as by a tributary. The 1924(b) priority, because it is based on the measurements at the reservoir, does not account for accessions to flow that joined the stream below upper valley users. Further, water that flows into the reservoir may be water that a UVD was entitled, but chose not, to take. The Decree does not provide for taking this water once it is stored (except as an apportionment). But the 1924(b) priority allows the user to appropriate the water. Finally, the water that enters the reservoir may actually be return flows from irrigation. UVDs are not entitled to divert that amount of water again as priority water. All of these arguments follow from one simple flaw in the reasoning behind the 1924(b) priority declarations: that the water commissioner looks to the level in the reservoir to determine whether the UVDs may exercise a priority right on a given day.

Fifth, the 1924(b) priority effectively deprives appropriators below the reservoir of water to which they are clearly entitled. As indicated as early as 1948, when the commissioner allowed UVDs to divert 2,563 acre feet under 1924(b), the San Carlos Indian Irrigation Project (SCIIP) complained that during every day in November

(a) That the gates at Coolidge Dam were open during the entire month and all water reaching them was allowed to pass through for use on lands below.

(b) That prior to November 8 the flow at Ashurst–Hayden Diversion varied from zero to a maximum of 7.0 cubic feet per second and that thereafter the flow did not exceed 31.0 cubic feet per second.

(c) That no stored water was released because none was available to the Project on any day, regardless of the data shown on the report.

Letter from C.A. Anderson, SCIDD District Engineer, to G.K. Dungan, Water Commissioner, January 14, 1949 (Stetson GRIC Report, Appendix A–6). Thus, the downstream senior appropriators were attempting to gain access to the natural flow for diversion on priority, but the water commissioner was allowing junior appropriators to divert on 1924(b) priority.

Finally, the 1924(b) priority is premised on the assumption that, if the water level in the reservoir is static or rising, the downstream users are storing water. Conditions in the reservoir often prevent the efficient release of water through the penstocks. First, the water may be just high enough above the penstocks to allow water to trickle through. Under these circumstances, water may flow in faster than it can escape the reservoir. Second, water may gradually get to an elevation such that it completely fills the penstocks in flowing out, but the rate at which it passes through may still be less than the rate at which water enters the reservoir. The rate at which water flows out is dependent upon the elevation of the water above the penstocks—the higher the water, the greater the pressure head, and the greater the rate of outflow. At a certain elevation, outflow reaches the maximum the penstocks can handle. Under any of these conditions, water may be entering the reservoir faster than the penstocks will allow it to flow out. *See generally*, Gookin Report, at 10.1–10.-34.

In spite of these facts, the water commissioner has declared that whenever the level of the reservoir rises, the United States is storing water. The commissioner then (1) declares 1924(b) priority days, and (2) makes supplemental apportionments to UVDs. GRIC argues that when water flows into the reservoir faster than it can escape, it is being delayed, not stored. This view comports with any common sense analysis of the situation. It is in fact difficult to believe that UVDs could seriously consider that GRIC and the United States are storing water when the level of the reservoir is so low they can barely release it. In making this assertion, UVDs rely partly on an order issued by Judge Sames in 1940, after UVDs requested relief under Article XII of the Decree. The Order states that

for the purposes of said Decree "Stored Water" ... considered by the Water

Commissioner in making apportionments ... means any water in the San Carlos Reservoir impounded therein and available for discharge to the lower users although such water accumulates through failure of the lower users to draw on the natural flow of the stream to the extent of their priorities; ...

Order on Petition to Review Action of Water Commissioner, Globe Equity No. 59 (January 22, 1940). The Order refers to impoundment, which generally refers to intentional capture and keeping. More importantly, there is no indication that the issue Judge Sames faced is the same one faced by the Court at this time, which is whether water should be considered stored if the downstream users are attempting to release it and take from the natural flow, but the physical constraints of the penstocks prevent them from so doing. The Court therefore finds that Judge Sames' Order does not foreclose analysis of this aspect of the storage issue.

UVDs also argue that the water should be deemed stored because whatever delay in the flow that occurs is the fault of the United States (for not installing still larger penstocks), not the fault of UVDs. The Court considers it immaterial whether "unintentional" storage could be eliminated, or nearly so, through the installation of larger penstocks. If there are thoughtful interpretations of the Decree which avoid the need for drastic measures such as rebuilding the dam, the Court will employ them. Furthermore, the Court is persuaded that UVDs are not harmed by an interpretation of the Decree which closes an untenable loophole.

Based on this analysis, the Court concludes, first, that the 1924(b) priority practice must be abolished. In its place the Rules Committee is directed to develop and recommend a system allowing for the exercise of prior calls on the flow of the Gila River. Such a system may or may not be similar to that proposed by the GRIC, but it must adequately account for the typical time lag in the water's travel downstream between Duncan–Virden, Safford, the San Carlos Reservoir, and Ashurst–Hayden Dam. The Court assumes that the members of the Rules Committee, exercising their judgment and knowledge of the Gila River system, and taking advantage of the expert reports already prepared in this litigation, as well as the assistance of the water commissioner, can develop a straightforward method of administering calls on the flow of the river which do not inure unfairly to the benefit of one party or another.

Second, the Court finds that water entering the reservoir is not "stored" for purposes of the Decree when the penstocks are fully open and downstream users are attempting to release water in the exercise of their prior rights, but are thwarted in the attempt by the physical limitations imposed by the penstocks.

Finally, the Court notes that, despite language which may suggest that the water commissioner erred in establishing and adhering to the 1924(b) priority practice, the Court is not of the opinion that the establishment of the priority was intended to injure downstream users or to give UVDs unfair advantages. The Court is persuaded, after reviewing all the evidence, that the water commissioner acted in a good faith attempt to carry out the administration of the Decree, and that he reasonably held the opinion that, absent an overriding interpretation by the Court, the 1924(b) priority method was suitable for ensuring that UVDs were able to exercise their rights.

IX. Diversions for Lands Not "Then Being Irrigated"

The Apache Tribe argues that the UVDs divert water in violation of the Decree. SCAT and the other plaintiffs seek to eliminate diversions for (1) decreed acreage lying fallow; (2) decreed acreage no longer used for farming; (3) decreed acreage not "then being irrigated"; and (4) non-decreed acreage.

The Decree provides in Article V that the right of direct diversion from the natural flow of the stream for each of said parties ... may be readily calculat-

ed, for the area *then being irrigated,* as follows:

No. of acres times 6 = Total allowable diversion in acre-feet during each irrigation season;

No. of acres times 1/80 = Rate of diversion in cubic feet per second which shall not be exceeded in making said draft

(Emphasis added.) Under this provision, diversions from the natural flow of the river are tied to the acreage "then being irrigated." The Decree further provides, in Article XI:

That the lands within the Gila River watershed for the irrigation of which rights are decreed herein are arid or semi-arid in character and require irrigation in order that crops of value may be produced thereon; that except as herein specifically provided no diversion of water from the natural flow of the stream into any ditch or canal for direct conveyance to the land shall be permitted as against any of the parties herein except in such amount as shall be actually and reasonably necessary for the beneficial use for which the right of diversion is determined and established by this Decree, to wit: shall be made only at such times as the water is needed upon their lands and only in such amounts as may be required under the provisions hereof for the number of acres *then being irrigated.*

(Emphasis added.) This clause is agreed by all parties to be a statement of the "beneficial use" doctrine, which limits both the volume and rate at which water is diverted in western states. *See, City of Colorado Springs v. Bender,* 148 Colo. 458, 366 P.2d 552, 555 (1966).

A. *"Then Being Irrigated"*

The evidence at trial indicates that the water commissioner allows diversions without considering whether land is "then being irrigated." Rather, diversions are based simply on the decreed acreage. Deposition of George Greiner, March 28, 1991, at 40–41; Tr. Nov. 14, 1991 at 15–17 (Testimony of Jon Allred). UVDs do not actually use the water on lands they are not irrigating, of course. Rather, this water is combined with water to which they are entitled, so that fields in cultivation may receive more than the 1/80th cfs provided for in the Decree.

There is little dispute that the commissioner should be directed to determine what acreage has been permanently removed from agricultural use. Clearly, such acreage includes lands now occupied by buildings, streets, roads, and parking lots within the districts. Such acreage, once identified, should then be subtracted from the total acreage from which diversions are calculated. The parties dispute, however, whether certain types of uses constitute permanent removal from agricultural use such that the acres should be deemed not "then being irrigated."

UVDs argue that the Court should employ a standard dictating that land is "then being irrigated" for purposes of the Decree if it is "being put to a beneficial use," Post–Trial Brief of the Upper Valley Defendants, at 18, or "being irrigated in accordance with reasonable farming practices," *Id.* at 17. These reasonable farming practices are further delineated to include land that is on a farm, is capable of receiving water and growing a crop, and is being used in connection with reasonable farming practices. *Id.* at 18. Under this standard, farm roads and farm buildings would be treated as land "then being irrigated."

The Court finds that this proposed standard must be rejected. The Decree language is not ambiguous: land that is being irrigated may receive water; land that is not may not receive water.

### 1. Houses, Canals, Farm Roads, and Farm Buildings

The farms in the upper valleys support many structures, roads, and canals, some permanent, some not. None of these may fairly be considered lands "then being irrigated." UVDs argue that because roads and buildings existed at the time the Decree was entered, these structures should be considered part of the acreage "then being irrigated." Also, UVDs argue that because the Decree lists lands in 40-acre sections, the drafters cannot have intended the lands within these sections to have been analyzed separately. These observations beg the question whether the drafters intended for the commissioner to determine whether lands were then being irrigated. Given UVDs own admission that lands for parking lots and non-farm buildings should be excluded, it is apparent that examination of the lands on less than 40-acre scales is possible.

The Court agrees with SCAT that land being used for farm structures, canals, and roads, as well as land permanently removed from farming uses, is not "then being irrigated" for purposes of the Decree. As noted in closing arguments, these sections of land add up rapidly, and when compared to the relatively small entitlement of the Apache Tribe, they can effectively subsume the Tribe's rights.

### 2. Fallow Lands

■ The United States and other plaintiff argue that fallow lands are not "then being irrigated." UVDs argue that they should be able to divert water for fallow land. The testimony at trial indicated that water is not needed for fallow land. Tr. Nov. 20, 1991, at 163, 211–12; Nov. 13, 1991, at 59; Nov. 21, 1991, at 181. Fallow land is not land "then being irrigated." *See also, Salt River Valley Water Users' Ass'n v. Kovacovich,* 3 Ariz.App. 28, 30, 411 P.2d 201, 203 (1966).

### 3. Pre-irrigation and Weed germination

■ Various UVDs testified that they pre-irrigate to prepare soils for crops, and that they water dormant fields to cause weeds to germinate so they can kill them.

The Court agrees with defendants that lands that are actually being irrigated in anticipation of a crop are "then being irrigated." The Apache Tribe argues that weeds are not a "crop of value" as defined in the Decree, and further argues that mechanical eradication of weeds was probably the only method anticipated by the drafters of the Decree. But the "crop of value" language should be read, in this instance, broadly enough to include a situation where the irrigation is a rational preliminary step to growing the "crop of value." Moreover, that the drafters did not envision weed-control methods involving irrigation is not a compelling reason to read it out of the Decree.

### 4. Federal Set–Asides

■ The amount of land that goes unused each year is significant; Wilbur Lunt testified that up to 25% of available land went fallow in cotton set-asides. Tr. Nov. 20, 1991, at 179–80. Land that is set aside in a federal set-aside program is not "then being irrigated."

### B. *"Stacking" Water*

■ The United States argues that UVDs impermissibly "stack" water, under the misconception that they own a floating water right which allows them to take water designated for, say, decreed acreage lying fallow, and divert it to decreed acreage being irrigated. The testimony at trial corroborates the view that UVDs engage in this practice. Tr. Nov. 21, 1991, at 184. UVDs argue that this practice is condoned by the Decree under Article XI, which provides:

> that rotation, which is a well known, recognized and effective practice in irrigation administration (constituting in effect the combining of flows allowed to be diverted from a given stream under two or more rights so as to provide for the alternate use of more adequate irrigation heads as between neighboring or other ditches taking from such stream), shall be permitted at all times and shall be required whenever necessary in order to obtain reasonable economies in the use of

water, or in order to give to each ditch or water user a more advantageous method of irrigation, providing that such rotation shall not injuriously affect any of the rights determined or allowed by this decree; ...

Under this provision, UVDs are clearly entitled to stack water to which they are otherwise entitled so that an adequate head for irrigation results. However, Article XI must be read in conjunction with the provisions of the Decree which prohibit the taking of water for fields not "then being irrigated." Thus, UVDs may engage in rotation with respect to water rights for fields "then being irrigated," by stacking water designated for several fields and using the water on one particular field; but they may not stack water designated for fields not being irrigated and use it on fields that are. In effect, water designated for acreage not "then being irrigated" is forfeited. Otherwise, the provisions limiting diversions for fields "then being irrigated" would be meaningless.

### C. Enforcement of Unauthorized Diversions

The parties have briefed various issues related to enforcement of the Court's decision on acreage no longer used for farming, or not currently being irrigated. The Court directs the Rules Committee to consider proposals for an aerial survey, or other methods, to determine which decreed acres are no longer used for farming purposes at all. These acres, once identified, can be removed from the total decreed acreage which serves as the basis for priority and apportionment determinations.

As to acreage "then being irrigated," the United States proposes that farmers report their intended land use prior to each irrigation season. The Decree defines an irrigation season as a calendar year. Decree, Article V. The testimony at trial indicates that, in general, farmers plan a year in advance, so the reporting requirement will not be a hardship. The Court agrees with defendants that a more frequent reporting requirement is unnecessary. However, the finalized reporting requirements must indicate that farmers must update their re-

ports if their farming plans are altered. Having the reports of the farmers compiled in each irrigation district, the water commissioner can then determine each canal's maximum monthly rate of diversion for the year ahead.

The Court further finds that a system of periodic audits to detect abuses in reporting practices should be established. The parties disagree on the question of appropriate penalties. The Court concludes that criminal penalties for these violations seem, at this stage, inappropriate. Therefore, a penalty scheme involving civil monetary fines and water-reduction penalties shall be devised.

The Court refers the issues of a survey plan, an appropriate reporting scheme, an audit plan, and a penalty schedule to the Rules Committee.

### D. Consumptive Use Formula

The Apache Tribe argues that the Court should alter the consumptive use formula to account for decreed lands no longer being irrigated. The Court finds this unnecessary.

### E. Reductions in Diversions of Stored Water

The San Carlos Irrigation and Drainage District argues that, regardless of the interpretation given to "then being irrigated," it does not apply to SCIDD's diversions of stored water. First, SCIDD argues that "then being irrigated" refers only to direct diversions of the natural flow of the Gila River for immediate use, and does not extend to diversions of stored water released from the reservoir. SCIDD notes that Article V begins by setting limits on diversions from natural flow, and then places the "then being irrigated" limitation. The right of direct diversion from the natural flow is different from the rights accorded SCIDD, however, because the Decree provides that the United States' right to store water

is specifically defined in Article VI and is of a different character that the rights directly to divert from the natural flow

of the stream, with which this Article of the Decree and the Priority Schedule made part hereof primarily has to do;

...

Decree, Article V. Second, SCIDD argues that, as a practical matter, if its diversions were limited according to acreage "then being irrigated," farming in the project area would cease.

Other parties to the litigation do not appear to disagree with SCIDD's analysis. The Court agrees that, to the extent that SCIIP's diversions in excess of the 1/80th cfs limitation are the result of stacking based on the number of decreed acres in the project area, these diversions do not violate the Decree. SCIIP, like any other party to the Decree, is limited by the 6 acre-feet total allowable diversion provided in the Decree, but its diversions of stored water shall not be deemed limited by the number of acres then being irrigated.

## X. Diversions in Excess of 1/80th cfs

UVDs have, during the last twenty years, diverted water in excess of the 1/80th cfs limitation on 1,084 instances, as documented in the Gookin Report. Such diversions are prohibited under the 1969 Decree entered in the Globe Equity 59 cases, which enjoined the commissioner

> from permitting at any time, including periods of sudden freshets or more plentiful natural flow, the diversion of water by water users above the San Carlos Reservoir at a rate greater than 1/80th of a cubic foot per second per acre so long as at the same time the storage and diversion water rights of all users as set forth in Article V are not being satisfied.

This decree was affirmed in *United States v. Gila Valley Irrigation District*, 454 F.2d 219 (9th Cir.1972). The Court agrees with GRIC that diversions in excess of 1/80th cfs violate the express terms of the Decree and the Ninth Circuit decision, if, at the time of the diversion, the rights of downstream users are not being satisfied. Both the canal companies and the water commissioner are charged with responsibility for ensuring that such diversions do not occur. The Court refers the issue of penalties for excessive diversions to the Rules Committee.

## XI. Conclusion

The Court is mindful of the fact that its determination of the issues before it may work substantial change in the administration of the Decree, and that UVDs will bear the brunt of its effects. The Court is not insensitive to the situation of the many farmers who rely on the Gila River for their livelihood. Lacking the power to increase the amount of available water, the Court is constrained to interpreting the Decree in such a way that all parties receive their fair entitlement, although perhaps none will receive what they really want. In this endeavor, the Court is guided by the principles of prior appropriation, the intent of the drafters of the Decree, and the reasonable interpretation of the terms of the Decree. To the extent possible, the Court has sought to resolve the issues of law and refer to the Rules Committee issues of administration, enforcement, and future planning. This litigation has had the beneficial effect of encouraging more open communications and negotiations among the claimants to the Gila River. In the opinion of the Court, this process, continued and expanded by the Rules Committee, may lead to more effective and fair distribution of the limited water resource involved.