655 F.2d 181
 81-2 USTC P 9646
 C. Arnholt SMITH, British Columbia Investment Company and
Westward Realty Company, Plaintiffs-Appellees,
v.
Roscoe L. EGGAR, Commissioner of Internal Revenue, and
William H. Connett, District Director of Internal
Revenue, Defendants-Appellants.
 No. 74-1149.
 United States Court of Appeals,
Ninth Circuit.
 Originally Argued and Submitted on Aug. 5, 1975.
Resubmitted After Two Intervening Remands Sept. 14, 1979.
Decided Aug. 31, 1981.
AS Corrected Sept. 16, 1981.
 
 Robert E. Lindsay, Washington, D. C., for defendants-appellants.
 Thomas Sheridan, Simon, Sheridan, Murphy, Thornton & Hinerfeld, Los Angeles, Cal., for plaintiffs-appellees.
 Appeal from the United States District Court for the Southern District of California.
 Before CHAMBERS and GOODWIN, Circuit Judges and TAYLOR, District Judge.*
 CHAMBERS, Circuit Judge:
 
 
 1
 On August 1, 1973, the Internal Revenue Service filed a jeopardy assessment in excess of twenty-two million dollars, for the single tax year of 1969, against C. Arnholt Smith. Two days later, specific and general levies were served on many persons and entities, including one on the United States National Bank (hereafter "the Bank"), covering the contents of a safety deposit box and of a room-sized depository in the Bank's vault area[1]. It is clear from what has developed that this area of the Bank contained documentary material that could in no way be considered as evidence of "assets" subject to levy. It is also very probable that the area contained "assets" which did not belong to Smith, but instead belonged to others.
 
 
 2
 All of this was done with considerable publicity. Smith's actual or threatened difficulties with the Securities and Exchange Commission, the Comptroller of the Currency, federal and State taxing authorities, and perhaps others as well, were the subject of much comment in the press and in business circles. The IRS jeopardy assessment, in this seemingly bizarre amount, and the levies, only added fuel to the fire.
 
 
 3
 On August 7, 1973, Smith (now joined by two companies in which he had a controlling interest) responded to the assessment and levies by filing this district court action against the Commissioner of Internal Revenue and the District Director[2], alleging that they had exceeded their statutory authority, that they were depriving plaintiffs of their property without due process of law, and that they were jeopardizing existing litigation and causing irreparable harm. The plaintiffs also immediately filed a motion for preliminary injunction and noticed a hearing on the order to show cause. With the district court's encouragement, however, the hearing was postponed to permit the interested parties to meet and under court monitoring, to discuss a resolution of the matters related to the assessment and levies.
 
 
 4
 On August 10, 1973, prior to any answer or other response to the plaintiffs' complaint, those involved in the negotiations agreed to an Agreement of Security (hereafter "the Agreement"), by which Internal Revenue agreed to subordinate its lien and to lift levies, in order to permit Smith to refinance large indebtednesses, many of which involved lending institutions. The Agreement, inter alia, included the following language:
 
 
 5
 "All levies upon the United States National Bank are to be withdrawn; Smith, however, shall cause the United States National Bank to provide the District Director with copies of the monthly bank statements on all accounts of Smith."
 
 
 6
 That same day (Friday, August 10), the parties presented the Agreement to the district judge and a consent order was filed, based on the stipulation of the parties, discontinuing appellees' motion for the preliminary injunction, ordering certain of the documents sealed, and concluding:
 
 
 7
 "That unless further application for relief is made to this Court on or before 60 days from the date hereof, this action shall as of that further date be dismissed without prejudice."
 
 
 8
 On Monday, August 13, Smith and one of his attorneys, named O'Sullivan, went to the depository and met with Bank officials. A telephone call was placed to the Tax Division attorney who had taken a leading role in the negotiations. He confirmed that the Agreement was in effect and that documents withdrawing the levies would be delivered shortly.
 
 
 9
 Smith and O'Sullivan entered the vault area, removed the seals, and removed papers from the safety deposit box and the depository (Depository "SO") and placed them in a suitcase and two briefcases. Smith also handed a bundle of papers to the president of Westgate-California, saying they were securities of Westgate and should be placed in a vault. Smith and O'Sullivan then took the papers to a law office in the Bank building, obtained a filing cabinet, and locked the papers in it. O'Sullivan kept possession of the key until he obtained a safety deposit box in which to keep the key. There is testimony that Smith, while they were awaiting delivery of the filing cabinet, reentered the vault and may have removed a folder.
 
 
 10
 That same day, the Commissioner learned that Smith had entered the vault area and removed papers. He charged that Smith had violated the Agreement and that this entitled him to rescind it. On August 15, steps were taken to initiate a grand jury investigation of Smith's activities relating to the entry and removal of the papers. The filing cabinet was placed near the vault area; appellees could not place it back inside the area as IRS had reseized and resealed the safety deposit box and the depository. The filing cabinet was, in time, seized and sealed.
 
 
 11
 From the outset the Commission has demonstrated a strong interest in retaining the assets and papers in this Bank area under seal and subject to the levy. Smith's position, from the outset, has been that the levy was not excluded from the Agreement, and was thus to be treated as any of the other levies that were withdrawn pursuant to the broad language of the Agreement. Smith is obviously interested not only in the assets that are located within the sealed area, but in his right to the privacy of the documents that are there and which are not "assets" subject to any levy by IRS. IRS admits that it would have no access to such documents by means of search warrant or subpoena over Smith's claim of the Fifth Amendment or over his reliance on the attorney-client privilege. IRS also admits that it cannot accomplish by jeopardy assessment and levy what it cannot do otherwise. But we would be naive not to acknowledge that there is great interest in the content of those papers. Surely the district judge seems to have recognized this.
 
 
 12
 On August 20, appellees made a motion to the district court asking that the Agreement be enforced. Extensive arguments were made, and evidence was submitted, but Smith declined to testify asserting his rights under the Fifth Amendment. The Commissioner found this frustrating but there was not much he could do about it. At the conclusion of the hearings, the district judge found that:
 
 
 13
 "... the entry of plaintiff C. Arnholt Smith, and his counsel, Thomas E. O'Sullivan, Esquire, into Room SO in the vault space of the United States National Bank on August 13, 1973, and the removal of papers and property therefrom was not in violation of the Agreement of Security of August 10, 1973, and was not a sufficient basis for any rescission of that Agreement."
 
 
 14
 The Court ordered compliance with the provisions of the Agreement and ordered the parties and their agents to:
 
 
 15
 "... comply with, enforce, execute, and carry out the terms of said Agreement; subject however, to a further order by this Court making reference to a Master to provide for the security of any interest which the United States may have upon any property or rights to property in certain receptacles within the vault space of the United States National Bank."
 
 
 16
 It is from this order of enforcement that this appeal was taken. But before proceeding to the issues on their merits, we must first dispose of Smith's argument that this Court is without appellate jurisdiction and with the Commissioner's argument that the district court was without jurisdiction. We disagree on both scores.
 
 
 17
 Although the order appealed from is not a "final" order in the usual sense, and no certificate has been filed under Rule 54(b), F.R.Civ.P., the order is sufficiently injunctive in nature to justify our taking jurisdiction under Section 1292(a)(1). The order explicitly commands compliance with the terms of the Agreement. Even if this were not so, on the facts of this particular case we would be inclined to view the order as so fundamental to the litigation that both policy and common sense would dictate that we assume jurisdiction under the rule of Gillespie v. U.S. Steel Corp., 379 U.S. 148, 85 S.Ct. 308, 13 L.Ed.2d 199 (1945). We therefore cannot accept appellees' contention that there is no appellate jurisdiction.
 
 
 18
 Nor can we accept the Commissioner's contention that the district court was without jurisdiction. He characterizes the complaint as one to enjoin the collection of taxes in violation of 26 U.S.C. § 7421, and asserts also that the government has not consented to be sued. Pursued to its limit, the Commissioner's reliance on Section 7421 might be seen as denying any taxpayer access to any court, in order to contest any action that the Commissioner might describe as "collection" activity, on any theory. The authority of the Commissioner is broad, but not that broad. We need not, on the facts of this case, follow his argument to its limit; it fails at the outset because he never contested the sufficiency of the complaint below. The complaint invokes the district court's jurisdiction under Section 1331 of Title 28. It also alleges violation of a constitutional right, i. e., that the appellees' property has been taken without due process of law in violation of the Fifth Amendment. Under the rule of Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946), if the Commissioner considered that the complaint failed to state a claim upon which relief could be granted, it was his prerogative to challenge the complaint on that ground under Rule 12, F.R.Civ.P. No challenge was ever made. Instead, the Commissioner voluntarily entered into an agreement with the plaintiffs and then sought a stipulated district court order based on that agreement. We will not speculate on what success such a challenge might, or might not, have had. Suffice it to say that appellees' complaint cannot here be characterized as frivolous or wholly insubstantial, and thus subject to an exception to the rule of Bell v. Hood, 327 U.S. at 682, 66 S.Ct. at 776. Given this state of the record, the Commissioner's attack on the jurisdiction of the district court is ill-founded. We therefore turn to the merits of the appeal.
 
 
 19
 The Commissioner contends that the district judge erred in holding that Smith had not violated the terms of the Agreement so as to justify rescission by IRS. He claims that although the Agreement states that "all levies" are to be lifted, this is not what he intended. He also argues that appellees really understood that the material that had been seized pursuant to the levy was not covered by the Agreement. Appellees deny this and argue, in reply, that the document says what it says, and "all" means "all". The Agreement is not ambiguous. Nevertheless, the district judge permitted the parties to argue at length on this issue and concluded, at the end, that there had been no violation of the Agreement by Smith. This Court very rarely interferes with a trial judge's findings as to intent; there is no reason to interfere here.
 
 
 20
 Section 6331(b) of Title 26, states very clearly that the term "levy" as used in that title, "includes the power of distraint and seizure by any means." It was not the job of the district court, any more than it is the job of this Court, to rewrite an agreement for a party who finds out, too late, that he should have been more careful in the negotiation process. These attorneys were not inexperienced. The Commissioner either directly or indirectly was represented at these negotiations by the Deputy Assistant Attorney General for the Tax Division, by the Chief Assistant to the United States Attorney and one of his assistants, by the Group Manager for Internal Revenue in San Diego and one of his assistants, and by an attorney for the Regional Counsel of the Internal Revenue Service. The Comptroller of the Currency was represented by counsel and a national bank examiner was present.
 
 
 21
 In summary, we reject the Commissioner's argument that the Agreement was intended to exclude from its scope property of the taxpayer located in the seized areas. Moreover, there was sufficient evidence to support the district judge's conclusions that Smith did not violate the Agreement, as it was drafted. Under the wording of the Agreement, Smith was prohibited from removing assets from the country or from secreting them. There is no evidence that he did either. He removed certain materials from the vault area, but this was not prohibited by the Agreement. Moreover, there is no evidence that Smith removed any of his "assets" from the area. The only evidence is that certain securities of Westgate-California were removed and given to an officer of Westgate-California. They were not the assets of the taxpayer, and they cannot be deemed such, unless it is determined that IRS is proceeding on an alter ego theory. The Agreement does not state that an alter ego relationship exists. Indeed, the district judge sought in vain throughout the hearing to determine just what the IRS theory was behind the twenty-two million dollar jeopardy assessment for 1969. The Commissioner, who has persistently avoided defining his theory, and has at times expressly denied reliance on an alter ego theory, cannot now claim that the removal of Westgate-California assets was in reality a removal of Smith's assets.
 
 
 22
 During the pendency of this appeal, the case has been remanded twice. The first was for a district court master to inventory the assets of value seized (which was done.) The second was to permit settlement conferences. The list of assets was filed under seal after examination by the district judge and by us. We invade the confidentiality of the process by saying that the things of value are only a slight fraction of the amount of the jeopardy levy. Obviously, Smith is fighting to protect the confidentiality of mere papers, which we hold he has a right to protect. We know of no way that that could be done except by an in camera inspection of the contents. This has been done. The papers of no monetary value should be promptly released to Smith, who had the possession of them.
 
 
 23
 This case should be settled without further argument about the Constitution.
 
 
 24
 Remanded for proceedings consistent herewith.
 
 
 
 *
 Fred M. Taylor, District Judge, United States District Court for the District of Idaho, sitting by designation
 
 
 [1]
 The bank area of the old United States National Bank has passed to the Crocker National Bank which acquired many of the assets of the United States National Bank and now conducts a banking business at the same stand
 
 
 [2]
 The officials named in the complaint were those in office at the time it was filed. The present officials have been substituted in their place as parties appellant