UNITED STATES of America,
Plaintiff–Appellee,

v.

GILA VALLEY IRRIGATION DISTRICT, et al.; State of Arizona, Defendants–Appellants,

v.

GILA RIVER INDIAN COMMUNITY; San Carlos Apache Tribe; San Carlos Irrigation District, Plaintiffs–Intervenors–Appellees.

No. 93–15076.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 16, 1994.

Submission Deferred March 25, 1994.

Resubmitted July 6, 1994.

Decided July 13, 1994.

L. Anthony Fines, Raven, Kirschner & Norell, Tucson, AZ, for defendants-appellants.

Robert L. Klarquist, U.S. Dept. of Justice, Environment and Natural Resources Div., Washington DC, for plaintiff-appellee.

Alfred S. Cox, Cox and Cox, Phoenix, AZ, for plaintiffs-intervenors-appellees.

Joe P. Sparks, Kevin T. Tehan, Scottsdale, AZ, and John H. Ryley, Phoenix, AZ, for San Carlos Apache Tribe of Arizona, plaintiffs-intervenors-appellees.

Before: CHOY, REINHARDT, and LEAVY, Circuit Judges.

CHOY, Circuit Judge:

## I. FACTUAL AND PROCEDURAL BACKGROUND

This is an appeal from the district court's interpretation of an elaborate Consent Decree entered in 1935. The dispute ultimately arises out of Global Equity 59, a suit filed by the United States in 1925, against all non-Indian users of the Gila River water.[1] The United States sued in its trustee capacity on behalf of the Gila River Indian Community (GRIC) and the San Carlos Apache Tribe (Apache Tribe). At that time, the GRIC attempted unsuccessfully to intervene. The suit ultimately resulted in a Consent Decree in 1935 (the Decree), which was stipulated to by the non-Indian parties, and the United States in its trustee capacity on behalf of the GRIC and the Apache Tribe.

---

**1.** For a more complete history of the events leading up to Global Equity 59, see *United States* *v. Gila Valley Irrigation District,* 454 F.2d 219, 220 (9th Cir.1972).

The Decree provides for a system of priorities, and was based on the law of prior appropriation, as well as compromise by the parties. Thus, with one exception, those parties who had earlier put the water to beneficial use were granted senior priorities to take that water over later users. The priority rights worked out to be exactly opposite (for purposes of this appeal) to the geographical location of the parties. The Gila River first flows past the Upper Valley Defendants (UVDs), who have a priority date of 1872. There is slightly less than 40,000 acres of land covered by the Decree in the Upper Valleys. Next, the river flows onto the Apache Tribe Reservation, where the Apache Tribe has a priority right dated 1846.[2] They have the right to divert 6,000 acre feet of water per year, delivered at a rate of 12.5 c.f.s., in order to irrigate 1,000 acres of land.[3] From there, the river flows into the San Carlos Reservoir (the Reservoir), formed by the Coolidge Dam. Below the Coolidge Dam is the Ashhurst–Hayden Dam, where the GRIC has a time immemorial right to 210,-000 acre feet of water to irrigate 35,000 acres of land. Finally, the United States has the right to store water in the Reservoir on behalf of the GRIC and specific other users below the Reservoir, such as the San Carlos Irrigation and Drainage District (SCIDD). This right is dated 1924.

There is one exception to this priority system. The UVDs have a right to take apportioned water, based on the amount stored for release in the Reservoir by the United States on behalf of the GRIC or the SCIDD. This right is held by the UVDs in disregard of the priority rights of users below the Reservoir. Water can be released from the Reservoir only to the GRIC and the SCIDD, not for use by the Apache Tribe.

All of the above mentioned diversions, save releases from the Reservoir of stored water, are to be taken from the "natural flow" of the Gila River.

The Decree is administered by a court-appointed Water Commissioner. The district court retained jurisdiction to enforce and interpret the Decree. The Decree calls for water to be allocated according to the above priorities by each party making a "first and prior call" up to the extent of its right to the available natural flow of the river. Decree, Article V, p. 12. However, the Water Commissioner never instituted a system of calls identifying the GRIC's exercise of its water right on its priority to the natural flow of the river, as distinguished from water released from storage in the Reservoir. Instead, the Water Commissioner invented 1924(b) priority. If the level of water in the Reservoir was found to be rising, the Water Commissioner presumed that the United States was exercising its 1924 priority right to store water on behalf of the GRIC, rather than the GRIC exercising its time immemorial priority right. Therefore, the Water Commissioner assumed that all priority rights prior to 1924 were satisfied. As a result, the Water Commissioner concluded that upstream users such as the UVDs were taking their water based on their priority right, not on their apportionment right. This was done retroactively, by looking back at the levels in the Reservoir, then changing the designation of UVDs' diversions from apportioned to priority on those days the level rose.

Also pertinent to this appeal, the Decree states that each user is only entitled to divert six acre feet per year for each acre "then being irrigated". This amount could be diverted at a rate not greater than 1/80 c.f.s. per acre, and was regardless of whether the diversion was pursuant to a priority or an apportionment right.[4] Decree Article V, p. 12, Article XI, p. 112. However, since the Decree was entered into, the Water Commissioner has allowed the UVDs to divert water

---

2. The right is held by the United States as trustee on behalf of the Apache Tribe, but for simplicity, it will be referred to as held by the Apache Tribe itself.

3. An acre foot of water is the amount of water needed to cover one acre of land in one foot of water. A c.f.s. is a measurement designating a cubic foot per second.

4. However, the district court held that this limitation did not apply to diversion of water stored in the Reservoir, then released. *United States v. Gila Valley Irrigation Dist.*, 804 F.Supp. 1, 18–19 (D.Ariz.1992). This ruling has not been appealed.

for all their acreage designated under the Decree (decreed acreage), and has never adjusted for acreage taken out of agricultural production, or for acreage put to agricultural uses, but not irrigated.

Finally, the Decree allows for "stacking", a process where all water allocated to several fields is stacked together and applied to one field at a time, thus creating extra water pressure. Decree, Article XI, p. 112. This practice results in more efficient farming.

The Decree has been interpreted numerous times by the district court, and this court has reviewed four of these decisions. *See United States v. Gila Valley Irrigation Dist.*, 961 F.2d 1432 (9th Cir.1992); *United States v. Gila Valley Irrigation Dist.*, 959 F.2d 242 (TABLE), Nos. 90–16720 & 90–16721, filed April 3, 1992, and amended June 5, 1992 (unpublished); *United States v. Gila Valley Irrigation Dist.*, 454 F.2d 219 (9th Cir.1972); *Gila Valley Irrigation Dist. v. United States*, 118 F.2d 507 (9th Cir.1941).

The current litigation arises out of the GRIC's intervention into Global Equity 59, followed by the intervention of the Apache Tribe. These two parties requested that the district court enforce the Decree to redress grievances asserted by these Indians. The United States is also a party to the litigation in its capacity as trustee, and supports the positions taken by both the GRIC and the Apache Tribe. The current phase of the litigation involves certain counts of the Apache Tribe's complaint, as well as certain counts of the GRIC's complaint.[5] Certain issues involved in this litigation were deferred by a court-approved stipulation until a later trial. This included all water quality issues.

The district court issued a "Final Memorandum and Order" on September 18, 1992. *United States v. Gila Valley Irrigation Dist.*, 804 F.Supp. 1 (D.Ariz.1992). The UVDs timely appealed from this Order.

**II. DISCUSSION**

*A. Standard of Review:*

 The district court's interpretation of a consent decree is reviewed de novo, but this court must defer to the district court's factual findings underlying that interpretation unless they are clearly erroneous. *United States v. Gila Valley Irrigation Dist.*, 961 F.2d 1432, 1434 (9th Cir.1992). The granting or denial of a preliminary injunction is subject to limited review, and will only be reversed where the district court abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact. *Senate of California v. Mosbacher*, 968 F.2d 974, 975 (9th Cir.1992).

*B. The Apache Tribe's Water Diversion System:*

The UVDs' first contention is that the district court erred in its holding regarding the Apache Tribe's proposed diversion system. Count One of the Apache Tribe's complaint sought a judicial interpretation of its decreed right to divert 12.5 c.f.s. from the river. In connection with this, the district court heard evidence regarding different systems that the Apache Tribe could use to divert its share of water from the river. While the court never approved or disapproved of any particular method of diversion, it did make the following ruling:

> *Method of diversion*: The Decree allows for diversions by ditches (gravity flow) and pumps. Decree, Article V.... But it does not require any one method, nor does it impose a reasonableness standard. The Tribe can no more be ordered to use a cost-effective or efficient method of diversion than the UVDs. Furthermore, what may appear cost-effective to the upper valley farmers may be simply beyond the financial reach of the Tribe. Therefore, the Court rejects the arguments that the Tribe is required to install pumps or drains

---

**5.** Some of the other counts of the GRIC's amended complaint were bifurcated by stipulation, resulting after trial in a judgment entered pursuant to Fed.R.Civ.P. 54(b). That judgment was affirmed by this court in *United States v. Gila Valley Irrigation Dist.*, 961 F.2d 1432 (9th Cir.

1992). Other counts were stayed by order of the district court, which was affirmed by this court in an unreported decision. *United States v. Gila Valley Irrigation Dist.*, 959 F.2d 242 (TABLE), Nos. 90–16720 & 90–16721, filed April 3, 1992, and amended June 5, 1992 (unpublished).

instead of canals, or to line its canals (which the UVDs do not generally do).... *Gila Valley Irrigation Dist.*, 804 F.Supp. at 8. The district court went on to refuse to hold that the Water Commissioner should be empowered to approve any new diversion system on the river, since the UVDs have never been subjected to approval of their systems, and the Decree contains no such approval authority for the Commissioner. *Id.*

■ Before making any substantive argument, the UVDs allege that the district court may have been improperly influenced by irrelevant evidence in making this ruling. They note that the district court heard evidence concerning the poverty, unemployment, infant mortality rate, and general oppression of the members of the Apache Tribe. In addition, the district court's opinion discussed the unfortunate story of Eskiminzin, an Apache who received unjust treatment at the hands of the United States. *Id.* at 4.

There is no indication in the district court's opinion that it was prejudiced in favor of the Apache Tribe. The district court also heard testimony regarding the adverse economic effect of any new interpretation of the Decree upon the various UVDs. In an equitable proceeding such as this, all such evidence is relevant to making an informed decision. There is no indication that the district court allowed its interpretation of the Decree to be clouded by taking into consideration the plight of the Apache Tribe. As the Apache Tribe points out, the district court ruled against them on at least four issues. There was no error in noting the history of the Apache Tribe.

According to the UVDs, the district court held that the Apache Tribe does not have to act reasonably when choosing and building a diversion system. They argue that this is contrary to both the law of prior appropriation, as well as contract interpretation. They claim that this interpretation will injure the UVDs, because the Apache Tribe could build an inefficient system which would require the UVDs to let more than 12.5 c.f.s. to pass undiverted in order to permit the Apache Tribe to divert 12.5 c.f.s. to the reservation.

The district court's opinion, when read in context, does not hold that the Apache Tribe can be unreasonable in choosing a diversion system. However, it does implicitly approve of the use of a gravity flow system. As the UVDs point out, consent decrees "should be construed basically as contracts." *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 236–37, 95 S.Ct. 926, 934, 43 L.Ed.2d 148 (1975). "[T]he scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." *United States v. Armour & Co.*, 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971). In this case, the Decree specifically identifies "Various Ditches and/or pumps & Ditches on or above Reservation" as the diverting and carrying structure for the San Carlos Indian Reservation where the Apache Tribe is located. Decree, Article V, p. 14. As the district court points out, the Decree allows diversion via a gravity system, as it specifically approves the use of ditches to divert.

■ The UVDs argue that because the Decree is construed as a contract, a standard of reasonableness is imposed on the performance of all the parties. Therefore, they argue that the court should enforce an implied duty not to act in such a way as to deprive other parties from receiving the benefits that can reasonably be expected to flow from the contract. The UVDs' argument lacks merit, however, because the implied duty of reasonableness does not control over explicit terms in a contract. Reasonableness in the standard of performance is only implied when a contract is silent as to the applicable standard. In this case, as discussed above, the Decree specifically allows the Apache Tribe to use *either* pumps or ditches. Because the Decree itself allows the use of ditches, it would not be reasonable for the UVDs to expect the Apache Tribe to use a system more efficient than a gravity diversion system.

■ Furthermore, the Apache Tribe is correct in its assertion that the remainder of the district court's opinion which holds that the Apache Tribe does not have to line their

canals is in accord with the general principles of prior appropriation law. The law of appropriation does not dictate that the senior user must use the most efficient diversion system. While it is true that "[t]he owner of a water right has no right as against a junior appropriator to waste water, *i.e.*, to divert more than can be used beneficially," *Weibert v. Rothe Bros., Inc.*, 618 P.2d 1367, 1371, 200 Colo. 310 (1980), neither does he have to be 100% efficient. The UVDs are correct in asserting that *Schodde v. Twin Falls Land and Water Co.*, 224 U.S. 107, 32 S.Ct. 470, 56 L.Ed. 686 (1912), in part stands for the assertion that the means of diversion must be reasonably efficient and not wasteful. However, when ditches and flumes are the usual and ordinary means of diverting water, "parties who have made their appropriations by such means cannot be compelled to substitute iron pipes, though they may be compelled to keep their flumes and ditches in good repair so as to prevent any unnecessary waste." *Barrows v. Fox*, 98 Cal. 63, 32 P. 811, 812 (1893). Here, unlined ditches are the usual and ordinary means of diverting water. Therefore, the Apache Tribe can no more be compelled to line their canals (which the UVDs do not generally do) than they could be required to substitute iron pipes.

The UVDs have cited no cases holding that the use of ditches to divert water rather than pumps is unreasonably wasteful, or that lining of canals is required. Therefore, the district court's determinations that the proposed gravity diversion system is not wasteful and that the Apache Tribe cannot be compelled to line their canals are not clearly erroneous.

Also, the UVDs' assertion that the galley pump system proposed would be more efficient is not necessarily true when applied to the Apache Tribe's situation. Pumps require electricity, which appears to be a somewhat rare commodity on the reservation. In addition, ditches are easier for the Apache Tribe to build and maintain, as well as repair after a flood. The district court's determination that the gravity system was not unreasonable

is a finding of fact, reviewed for clear error. *United States v. Gila Valley Irrigation Dist.*, 961 F.2d at 1434. The UVDs have failed to show that the district court committed clear error in making this finding.

Moreover, as the United States points out in its brief, the district court's ruling must be taken in the context of the entire opinion. The district court addressed this issue under four subheadings ("Method of Diversion", "Conveyance Losses", "Flow for adequate head", and "Lining"). Taken in context of the entire holding, the district court's opinion did not grant the Apache Tribe the right to be unreasonable in choosing a diversion system; it refused to hold them to either a standard different from that in the Decree, or a higher standard than that to which the UVDs have been held. Viewed as such, the district court did not err, and we will not second guess its determination, which was based on extensive testimony from experts for both sides.[6]

## C. The Abolition of the Water Commissioner's "1924(b)" Practice:

The UVDs also contend that the district court erred by ordering that the Water Commissioner cease its current practice of labeling certain days "1924(b)" days. Under the Decree, the United States can store water in the San Carlos Reservoir on behalf of the GRIC and the SCIDD. The Decree dictates that if the United States stores water in the Reservoir, then the UVDs can take from the river up to the amount stored as "apportioned" water, regardless of the GRIC's immemorial right. Therefore, the UVDs have two types of water rights. First, they have a priority right dated 1872, which is inferior to the priority rights of GRIC and the Apache Tribe. In addition, they have an apportioned right which is superior to the immemorial right of the GRIC. The extent of the apportioned right corresponds to water stored in the Reservoir by the United States for the benefit of the GRIC and SCIDD.

---

**6.** If the Apache Tribe does act unreasonably in choosing its diversion system, such that it violates prior appropriations law, the UVDs can challenge its action at that time. However, we must assume for the present that the district court's opinion will be interpreted in a reasonable manner.

For this reason, the Water Commissioner developed a system for labelling those days that the river is flowing at a high enough capacity to satisfy all water users, while differentiating between those days that the GRIC is storing water, and those days when it is merely using its priority water right. The Water Commissioner accomplished this by retroactively labeling each day on which the water level in the Reservoir was found to be rising a 1924(b) day. On days labeled 1924(b), the UVDs' water uses were attributed to their priority claim, and not charged against their apportionment.

The district court examined this labeling system, and found six reasons for its being deficient:[7] (1) The Decree does not provide for a practice of retroactively labeling the days to reflect when the Reservoir is storing water, but rather requires the development of a call system to establish when the various users are calling for water under a priority right; (2) the 1924(b) system effectively assures the UVDs of more than the amount of water provided for them in the Decree on any day the 1924(b) priority is declared; (3) the 1924(b) priority is inconsistently declared; (4) the 1924(b) priority declaration allows the UVDs to take advantage of water that they were never entitled to; (5) the 1924(b) priority effectively deprives the appropriators below the Reservoir of water they are clearly entitled to; and (6) the 1924(b) priority is premised on the presumption that if the water level in the Reservoir is static or rising, the downstream users are storing water. *Gila Valley Irrigation Dist.*, 804 F.Supp. at 13–14. For these reasons, the district court held the 1924(b) priority labeling practice should be abolished:

> Based on this analysis, the Court concludes, first, that the 1924(b) priority practice must be abolished. In its place the Rules Committee is directed to develop and recommend a system allowing for the exercise of prior calls on the flow of the

Gila River.... The Court assumes that the members of the Rules Committee, exercising their judgment and knowledge of the Gila River system, and taking advantage of the expert reports already prepared in this litigation, as well as the assistance of the water commissioner, can develop a straightforward method of administering calls on the flow of the river which do not inure unfairly to the benefit of one party or another.

*Id.* at 15.

The UVDs do not disagree with three of the six reasons (the third, fifth and sixth reasons listed above) which the district court asserted as grounds for finding the 1924(b) practice erroneous. They claim these deficiencies are based on implementation of the 1924(b) practice. They do not object to alteration of the practice to address these reasons. They do, however, object to the other three grounds, and claim that they do not justify abandoning the 1924(b) practice.

The UVDs' argument that three of the reasons for abolishing the 1924(b) practice are erroneous does not lead to the conclusion that the district court was wrong in abolishing the practice. The other three reasons, which the UVDs do not dispute, are sufficient in and of themselves to justify abolishing the practice.[8] This court can affirm the district court's decision on any ground supported by the record, even those not relied upon by the district court. *United States v. Washington*, 969 F.2d 752, 755 (9th Cir.1992), *cert. denied*, ⸻ U.S. ⸻, 113 S.Ct. 1945, 123 L.Ed.2d 651 (1993).

For instance, one of the reasons cited by the district court for rejecting the practice which the UVDs do not dispute is that the practice effectively deprives appropriators below the Reservoir of water to which they are clearly entitled. *Gila Valley Irrigation Dist.*, 804 F.Supp. at 14. This reason alone is enough to justify discontinuing the prac-

---

7. While the district court listed six reasons that the 1924(b) labeling system should be abolished it also noted that "[t]here are so many problems with the 1924(b) priority it is difficult to list them all." *Gila Valley Irrigation Dist.*, 804 F.Supp. at 13.

8. Because we find that the district court's ruling can be upheld on the three reasons which the UVDs do not dispute, we make no comment at this time as to the merit of the UVDs' argument that the other three reasons given by the district court for the practice being deficient do not justify abandoning the practice.

tice. The UVDs argue that this is based on the implementation of the 1924(b) practice, not the practice itself. They state that they would have no objection to alteration of the implementation of the practice to address these "factually based reasons."

The UVDs state that they do not object to improving methods to determine when the Reservoir is storing water. Their real objection is that the abandonment of the 1924(b) practice could be interpreted to mean that water may be stored in the Reservoir on a priority earlier than 1924 or when other users above the Reservoir with priority dates earlier than 1924, such as most UVDs and the Apache Tribe, are not permitted to divert water.

The UVDs do not point to, nor does there exist anywhere within the district court's opinion any holding that the Reservoir may store water when other users with earlier priorities cannot divert, nor does the opinion permit storage in the Reservoir of water on a priority earlier than 1924. The district court's order rejects a practice that does not comport with the provision of the Decree which explicitly directs that a call system be used. *See id.* at 13, 15.

The UVDs' argument boils down to the fear that the Rules Committee will interpret the district court's order as allowing the storage of water in the Reservoir when it is not allowed to by the Decree. It is unclear whether the section of the Decree cited by the UVDs (Decree, Article VI, ¶ 5 p. 105) limits the storage of Reservoir water in the way the UVDs claim. However, we need not decide at this point the meaning of the Decree in this respect. The UVDs have advanced mere speculation as to what the Rules Committee will do. The Rules Committee may come up with a call system that addresses the UVDs' concerns, yet eliminates the problems identified by the district court. If we were to rule on this issue at this point, it would be an advisory ruling on a issue which is not yet ripe, and may never ripen into a controversy. This court is not empowered to issue advisory opinions. *In re MacNeil,* 907 F.2d 903, 904 (9th Cir.1990). Therefore, we affirm the district court's holding abolishing

the 1924(b) practice and directing the Rules Committee to develop a new practice.

### D. Apache Tribe's Priority Right Compared to UVDs' Apportionment:

The UVDs next claim that the district court erred in holding that the Apache Tribe's priority right is superior to the UVDs' apportionment right. According to the Decree, for the purposes of this appeal, the GRIC has the most superior priority right (time immemorial), the Apache Tribe has the next highest (1846), and the UVDs have the last priority right (1872). However, the UVDs have the right to take apportioned water, based on the amount of water stored in the Reservoir, "in disregard of the aforesaid rights of plaintiff (the United States as trustee) used on lands below said reservoir (the San Carlos Reservoir)...." Decree Article VIII, p. 106. The Apache Tribe has no apportionment right.

Emphasizing the language that states that the apportionment is in disregard of lands *below* the Reservoir, the district court held that while the UVDs can exercise their apportionment right in disregard of the GRIC's immemorial priority, they cannot exercise it in disregard of the Apache Tribe's priority right, which is superior to the UVDs' right of diversion:

> Under this provision, the UVDs' apportionment rights are "in disregard of" only the United States' immemorial right on behalf of the GRIC. That GRIC's rights may be held in derogation of the UVDs' rights does not imply that the Apache's right may be similarly derogated, simply because it is junior to GRIC's right....
>
> Accordingly, the Court finds that the Apache Tribe's prior right to 6,000 acre-feet of water from the flow of the Gila River is superior in all respects to the rights of the UVDs to the flow of the river. If, at any time, the Apache Tribe asserts its prior right to the natural flow of the Gila River, UVDs may not divert water either on priority or apportionment.

*Gila Valley Irrigation Dist.,* 804 F.Supp. at 6–7.

The UVDs argue that the correct interpretation of the Decree is that the UVDs can

use their apportionment right in disregard of the Apache Tribe's 1846 right as well the GRIC's immemorial right, because to do so does not in fact deprive the Apache Tribe of anything. They argue that the Apache Tribe can only divert from the river "to the extent that such waters are available" under its 1846 priority. However, under its priority right, the Apache Tribe cannot divert water unless there is greater than 437.5 c.f.s. in the river (the GRIC's immemorial priority right). Therefore, if the UVDs use their apportionment right to take the first 437.5 c.f.s., they are only taking in disregard of the GRIC's immemorial right, not the Apache's 1846 right, since these c.f.s. were never "available" to the Apache Tribe.

The UVDs find support for their interpretation in the words of intent in the Decree. In language which precedes the language granting the apportionment right, the Decree states that the compromise is made "in recognition of the desirability of making it practicable for said defendants to carry on the irrigation of said upper valley ... so that the said San Carlos Act shall inure in part to their benefit...." Decree Article VIII p. 106. The UVDs point out that due to the amount of water flowing in the Gila River, even in a relatively wet year the river only flowed more than 450 c.f.s. (the 437.5 of GRIC's right plus the 12.5 c.f.s. of the Apache Tribe's right) on twenty-one days. Therefore, they say the district court's interpretation will render it impracticable to carry on the irrigation of their lands, by nullifying the benefit of the compromise they struck.[9] However, the UVDs ignore the fact that if this court accepts their interpretation, it would be impracticable for the Apache Tribe to carry on its irrigation.

The United States and the Apache Tribe argue that in spite of the potential consequences, interpretation of the Decree as a contract leads to the conclusion that the district court was correct. They assert the language of the Decree unambiguously states that the apportionment right can only be exercised in disregard of the rights of users *below* the Reservoir. They point out that the Apache Tribe's lands are situated *above* the Reservoir. Therefore, construing the Decree by the language "within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it," *United States v. Armour & Co.*, 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971), the Apache Tribe's priority right is not inferior to the UVDs' apportionment right.

The United States and the Apache Tribe also point out that their interpretation is supported by the physical setting. The GRIC's priority right can be disregarded with respect to the apportionment right because, being below the Reservoir, they have the power to release water from the Reservoir to meet their needs. However, the Apache Tribe is situated above the Reservoir, and cannot take advantage of water stored in the Reservoir. The district court accepted this logic:

> The UVDs' argument is also at odds with the apparent intent of the Decree, which is to ensure that the UVDs can divert water when there is, in fact, water in the Reservoir to satisfy the needs of the lower valley users. Apportionments of water are linked with storage in the Reservoir. The United States cannot, under the Decree, store water for the benefit of the Apache Tribe. Therefore, to read the Decree in such a way that allows the UVDs to satisfy their requirements through apportionments, at the expense of the Apaches' priority right, effectively eliminates the benefit of the Apaches' 1846 priority altogether.

*Gila Valley Irrigation Dist.*, 804 F.Supp. at 6. This reasoning has merit, as the Apache Tribe in no way benefits from storage of water in the Reservoir.

■ This court has recognized certain canons for interpretation of Indian treaties. "These canons call for promoting the treaties' central purposes; construing treaties as they were originally understood by the tribal representatives, rather than according to legal technicalities; resolving ambiguities in favor of the Indians; and interpreting the treaties in the Indians' favor." *United States v. Washington*, 759 F.2d 1353, 1358 (9th Cir.), *cert. denied*, 474 U.S. 994, 106 S.Ct.

---

9. This argument is based on the circular priority problem discussed *infra*.

407, 88 L.Ed.2d 358 (1985). The same canons have been held to apply to Executive Orders. *United States v. Washington,* 969 F.2d at 755.

These canons should also be applied in appropriate situations involving contracts or consent decrees between Indians and non-Indians. *See United States v. Ahtanum Irrigation Dist.,* 236 F.2d 321, 340 (9th Cir.1956) (holding that agreement between Secretary of the Interior on behalf of the Indians and white settlers, "as other agreements relating to Indian rights, is to be construed most strongly in favor of the Indians"), *cert. denied,* 352 U.S. 988, 77 S.Ct. 386, 1 L.Ed.2d 367 (1957). In fact, in an earlier case interpreting this Decree, this court stated that the Decree is to be interpreted in a manner favorable to Indians. "While *Ahtanum* and *Gila Valley* may require that a court interpret the Decree in a manner favorable to GRIC, neither case requires that findings of fact ... be slanted in favor of GRIC." *United States v. Gila Valley Irrigation Dist.,* 961 F.2d 1432, 1437 (9th Cir.1992). *See also id.* at 1437–38 n. 3. Therefore, the interpretation or definition of potentially ambiguous terms in the Decree should be construed in favor of the Indian's interests.

■ The canons of construction for interpreting agreements with Indians shift the balance in favor of construing this Decree to read that the UVDs' apportionment right comes after the Apache Tribe's priority right, since the UVDs' apportionment right can be exercised only in disregard of the rights of users, *below* the Reservoir. The district court did not err in adopting this reasonable interpretation.

The UVDs point out that this interpretation has the potential to effectively render their apportionment right meaningless, and therefore eliminate any benefit that the UVDs gained by their compromise in settling via the Decree. This is based on the creation of a circular priority, where the UVDs' apportionment right is superior to the GRIC's priority right, but the Apache Tribe's priority right is superior the UVDs' apportionment right, and finally, the GRIC's priority right is superior to the Apache Tribe's priority right. They argue that if the Apache Tribe asserts

its right to its 12.5 c.f.s., the Apache Tribe will have no right to keep that water, since its priority right is inferior to the right of the GRIC. Therefore, they would have to let that water pass to the GRIC, then call for another 12.5 c.f.s., which they would again have to let pass until the GRIC's priority right of 437.5 acre feet has passed. Then they would finally be able to keep their 12.5 c.f.s. once the GRIC's prior right is satisfied, and only then could the UVDs take their apportionment. However, by this point, the UVDs would also be able to exercise their priority right, thus rendering the apportionment right illusory.

We find that any potential circularity problem is not ripe for adjudication. The district court has directed the Rules Committee to establish a "call system" for water upon the Gila River under the priorities established by the Decree. We are optimistic that the Rules Committee will be able to formulate a system that eliminates the UVDs' concerns regarding circularity, and preserves their apportionment right, without jeopardizing the Apache Tribe's priority right. The Rules Committee's determinations regarding a call system will be later subject to approval by the district court. *See Gila Valley Irrigation Dist.,* 804 F.Supp. at 5.

### E. The Interpretation of "then being irrigated":

The Decree provides in two separate places that water may be diverted from the Gila river only for lands "then being irrigated." Decree Article V, p. 12, Decree Article XI, p. 112. The phrase "then being irrigated" is not defined anywhere in the Decree. Up until the district court's ruling in this case, the Water Commissioner had not adjusted the maximum rates and volumes of the UVDs' diversions to reflect what lands were being irrigated, and what lands were not, but instead allowed the UVDs to divert for their full decreed acreage without determining whether those lands were being irrigated.

The Apache Tribe challenged this practice, arguing that the court should eliminate diversions for decreed acreage lying fallow,

decreed acreage no longer used for farming, and decreed acreage not "then being irrigated". The district court ruled that "[t]he Decree language is not ambiguous: land that is being irrigated may receive water; land that is not may not receive water." *Gila Valley Irrigation Dist.*, 804 F.Supp. at 16. Consequently, the district court held that not only must the Water Commissioner remove from the calculation of acreage those lands that have been permanently removed from agricultural use, such as streets, roads, and parking lots in the districts, but also lands being used for farm structures, canals, and farm roads. The district court found all these lands to fall outside the language specifying lands "then being irrigated" for purposes of the Decree. *Id.* at 17. In addition, the district court held that fallow lands also do not fit within the language of the Decree, since fallow lands do not need water. *Id.*

The UVDs contend that the district court's interpretation is too narrow. They claim that because the phrase "then being irrigated" is not defined in the Decree, the meaning of the phrase can only be determined by examining the Decree as a whole, and how it has been implemented. They argue that because farm roads and farm buildings existed at the time the parties entered into the Decree, and yet the original parties did not reduce diversions to reflect this, the original intention of the drafters was to include within the definition of "lands then being irrigated" lands which were dedicated to reasonable farming practices, such as farm buildings and farm roads. They also argue that land lying fallow is also being used for reasonable farming purposes, and so should also fall within the phrase.

■ The UVDs' argument lacks merit, because it is based upon the assumption that the phrase "lands then being irrigated" needs further definition. However, the phrase itself is clear and unambiguous, as the district court held. Therefore, there is no need to examine the implementation of the Decree to determine how to define the phrase. The language clearly includes only those lands which are being irrigated, that is those lands upon which water is being placed in order to grow crops. For this reason, the

UVDs' reliance upon *Blinderman Construction Co. v. United States*, 695 F.2d 552 (Fed. Cir.1982) is misplaced. This court has already rejected the argument that contemporaneous construction by the parties to the Decree must be given weight, where the terms of the Decree are unambiguous. "While it is true that rules of construction, such as the rule in *Blinderman*, may be appropriate in interpreting a consent decree, we will only apply such rules if the terms of the decree are *ambiguous*." *United States v. Gila Valley Irrigation Dist.*, 961 F.2d at 1440 (emphasis in original, citations omitted).

■ The district court's holding that fallow lands are not lands "then being irrigated" is also supported by the "beneficial use" doctrine under Arizona law. All parties agreed that the language in the Decree was a statement of the "beneficial use" doctrine. *See Gila Valley Irrigation Dist.*, 804 F.Supp. at 16. In *Salt River Valley Water Users' Ass'n v. Kovacovich*, 411 P.2d 201, 3 Ariz. App. 28 (1966), the Court of Appeals of Arizona examined the issue of whether an owner of land with a water appropriation right may through water saving practices apply the water saved to immediately adjacent lands. The court held that it could not apply such water to lands other than those to which the original appropriation was appurtenant. "Again the need for land to lie fallow from time to time is a well recognized, beneficial need.... Although this may be a commendable practice, this is not sufficient to alter the established doctrine with respect to use of water." *Id.* at 203, 3 Ariz.App. at 30. While that case is not entirely analogous here, it is instructive of how Arizona employs the beneficial use doctrine. Just as in *Salt River Valley*, where the conservation of water did not alter the fact that the users had no right to extend the amount of land irrigated under their appropriation, the UVDs are not able to extend the acreage of land "then being irrigated" by engaging in the reasonable farm practice of allowing certain lands to lie fallow.

Therefore, because the language of the Decree is unambiguous, and only allows diversion for use on lands then being irrigated, the district court was correct in holding that

the Water Commissioner must exclude from his calculation of acreage "then being irrigated" lands which are lying fallow, as well as those lands which are used for other farming purposes such as farm roads, farm buildings, and canals.[10]

### F. Stacking Water:

The United States challenged the UVDs' practice of "stacking" water, that is taking water designated for decreed acreage lying fallow, and diverting it to decreed acreage being irrigated. The district court noted that the Article XI of the Decree allows "stacking" of water by permitting all water allocated to several fields to be stacked together and applied to one field at a time, in order to obtain an adequate head of water for efficient irrigation, so long as the users are in fact entitled to that water. However, the district court concluded that under the terms of the Decree that limits diversion for lands "then being irrigated", the UVDs "may not stack water designated for fields not being irrigated and use it on fields that are. In effect, water designated for acreage 'not then being irrigated' is forfeited." *Gila Valley Irrigation Dist.*, 804 F.Supp. at 18.

The UVDs argue that we should reverse the district court's ruling, because it does not comport with reasonable farming practices. They argue that despite the fact that it appears to follow the Decree's language regarding "then being irrigated", we should reject the district court's interpretation due to the hardship imposed upon the UVDs in its application.

The UVDs argue that the effect of the district court's interpretation is such that if some UVDs cease farming operations, instead putting the land to non-agricultural uses, other UVD farmers will consequently be faced with a reduction in the number of c.f.s. available for them to stack. Therefore, they argue that the Decree forces some farmers to quit farming just because their neighbors decided to quit farming. While this potential result is unfortunate, it is a consequence of the language of the Decree, which only allows a certain diversion rate per acre of land which is being irrigated.

The UVDs' argument that the language of the Decree results in hardship on the UVDs does not change the fact that the district court correctly construed the unambiguous terms of the Decree. The diversion rate of 1/80 c.f.s. per acre being irrigated is applicable to all parties to the Decree, not just to the UVDs (with the exception of water released after storage in the San Carlos Reservoir).

Therefore, since the water available to all the users under the Decree is slated for agricultural use, all of the parties need to conform their farming practices so that they can feasibly be carried out within the constraints of the Decree. The fact that in the past the UVDs have been allowed to take more than their share of water due to the practices of the Water Commissioner (at the expense of the Apache Tribe) is no argument in favor of allowing them to continue this in the future. We affirm the district court's interpretation of the Decree regarding "stacking".

### G. Preliminary Ruling Regarding Diversion of Entire River:

The UVDs' next contention is that the district court erred in making a preliminary ruling that the UVDs could not divert the entire stream of the Gila River when the Apache Tribe has made a request for water, but must let enough water to satisfy the Apache Tribe's priority request pass their diversion dams undiverted.[11] The district court ruled that the UVDs must discontinue diverting the entire stream, on the basis of

---

10. We also reject the UVDs' suggestion that we utilize 43 C.F.R. § 426.4(1) in order to define "lands then being irrigated." That section defines "irrigable land" for the purposes of projects governed by federal reclamation law. Not only does 43 C.F.R. § 426.4 not apply to the Decree in question, but also the phrase "irrigable land" has a plain meaning which is broader than the phrase "then being irrigated".

11. Apparently it is the practice of some UVD farmers to divert the entire stream of the Gila River by using diversion dams, then allowing the water to return to the stream as an irrigation "return flow".

the language of the Decree, which in Article VI(2) gives them the right to the "natural flow" of the river:

> However, the Court agrees with the Tribe that "natural flow" is not the same as irrigation return flows. The testimony at trial unequivocally indicates that return flows are inferior and higher in salts.... Because the Tribe is entitled to 6,000 acre-feet of natural flow, UVDs should be prevented from diverting the *entire* flow of the Gila River when the Tribe is exercising its prior rights. To the extent that the Tribe asserts is (sic) prior right to flow in the upper valleys, the amount called for must be allowed to pass undiverted....

*Gila Valley Irrigation Dist.*, 804 F.Supp. at 7. The UVDs argue that the district court erred in making this ruling, because by stipulation the parties had agreed to defer all water quality issues to further litigation, which is scheduled to occur in November. The district court recognized this, stating:

> The Court considers this analysis of the natural flow issue to be preliminary. If, during the next phase of the litigation, the Court is persuaded that the UVDs may divert the entire flow of the stream without compromising the Tribe's right to natural flow, or without degrading the water to any greater extent than if some portion of it went undiverted, the Court will modify this aspect of the order in accordance with the evidence.

*Id.*

The UVDs claim that because the effect of the holding is to preclude the UVDs from diverting the entire flow of the river until the next phase of the litigation in November of 1994, it really is the equivalent of a preliminary injunction. They argue that it was improper for the district court to issue an injunction without complying with the notice provisions of Fed.R.Civ.P. 65(a)(1). In addition, due to the stipulation regarding water quality issues, they argue that they were prevented from introducing evidence regarding water quality. The combination of these two aspects allegedly did not give the UVDs a fair opportunity to contest the ruling issued by the district court.

■■■ As a preliminary matter, we must decide whether the district court's order is subject to appeal. The United States contends that this ruling is not final, and therefore not appealable under 28 U.S.C. § 1292(a)(1). It argues that the district court did not in fact issue a preliminary injunction, because no motion for interim relief was made, no notice pursuant to Rule 65(a)(1) was given, and the pretrial order made no mention of interlocutory relief. Therefore, it says the district court's preliminary conclusion regarding "natural flow" is a nonfinal declaratory ruling, and is not appealable.

We find that the district court's preliminary conclusion regarding the "natural flow" of the water is appealable, because it is sufficiently injunctive in nature. The district court's order explicitly directs the UVDs to allow the amount of water called for to pass through undiverted. The practical effect of it is to restrict diversions until further litigation. "In determining whether or not an order is appealable under § 1292(a)(1), the courts do not look to the terminology of the order but to its substantial effect." *Lewis v. Bloomsburg Mills, Inc.*, 608 F.2d 971, 973 (4th Cir.1979). The district court's order is analogous to that in *Smith v. Eggar*, 655 F.2d 181 (9th Cir.1981). In that case, the district court ordered that the IRS comply with the terms of an agreement, "subject however, to a further order by this Court making reference to a Master to provide for the security of any interest which the United States may have" regarding property rights to certain documents in a United States National Bank vault. *Id.* at 184. This court held this order appealable, because:

> [a]lthough the order appealed from is not a "final" order in the usual sense, and no certificate has been filed under Rule 54(b), F.R.Civ.P., the order is sufficiently injunctive in nature to justify our taking jurisdiction under Section 1292(a)(1). The order explicitly commands compliance with the terms of the Agreement.

*Id.*

*Smith* is analogous because just as in this case, the order was subject to potential modification by further court proceedings, but

because it commanded explicit action at the present time, it was sufficiently injunctive in character to be appealable under § 1292(a)(1). *See also Inter–Regional Fin. Group, Inc. v. Hashemi,* 562 F.2d 152, 154 (2d Cir.1977) (finding that where defendant was required by court order to bring certificates into the State of Connecticut from locations in other states and other countries, district court correctly treated it as an injunction), *cert. denied,* 434 U.S. 1046, 98 S.Ct. 892, 54 L.Ed.2d 798 (1978); *Frederick L. v. Thomas,* 557 F.2d 373, 380 (3d Cir.1977) (holding court's command that a district submit a plan to identify all learning disabled pupils was an appealable mandatory injunction); *Reed v. Rhodes,* 549 F.2d 1050, 1051 (6th Cir.1976) (finding that while direction to assist in the development of a remedy is not appealable, the direction not to proceed with construction of new facilities is appealable as an injunction). In the case at bar, the UVDs were ordered to do an act, the act of allowing called-for water to pass undiverted, as well as not to do an act, that is not to divert the entire river when a call is made. Therefore, this order is appealable as an injunction.

■■■ A district court's order regarding preliminary injunctive relief is subject to limited review. The grant or denial of a preliminary injunction will be reversed only where the district court abused its discretion or based its decision on an erroneous legal standard or clearly erroneous findings of fact. However, questions of law underlying the issuance of a preliminary injunction are reviewed de novo. *Mai Sys. Corp. v. Peak Computer, Inc.,* 991 F.2d 511, 516 (9th Cir. 1993), *cert. dismissed,* —— U.S. ——, 114 S.Ct. 671, 126 L.Ed.2d 640 (1994). "On a motion for a preliminary injunction an adequate presentation of the facts is necessary.... The opposing party must be afforded the opportunity to cross-examine the moving party's witnesses and to present evidence." *Visual Sciences v. Integrated Communications Inc.,* 660 F.2d 56, 58 (2d Cir.

1981). While this circuit has held that a preliminary injunction may be granted or denied on the basis of affidavits, *San Francisco–Oakland Newspaper Guild v. Kennedy,* 412 F.2d 541, 546 (9th Cir.1969), the party must be not be denied the opportunity to be heard. *Id.* In the case at bar, the UVDs were effectively prevented from presenting evidence, because it was stipulated that water quality issues would be deferred until a later trial. On this stipulation, the district court sustained at least one objection when the UVDs attempted to introduce evidence on water quality issues. However, the court allowed the Apache Tribe to introduce evidence that the UVDs' diversions degraded the quality of the water, over the UVDs' objection.

The Apache Tribe argues that the district court did not rule on a water quality issue, but instead merely held that because the Decree states that the Apache Tribe is entitled to divert from the "natural flow" of the river, diversion of the entire river violates the Decree. Therefore, diversion of the entire river would not be allowed regardless of whether or not it degraded the water quality. However, this assumes too much. As the UVDs point out, the record does not support, nor did the district court explicitly hold that if the entire river is diverted, all water below the diversion dam will be return flows. The experts who testified all stated that the water below the diversion dams might consist of subflow or water from springs along the river bed. They were unable to pinpoint in what proportions these would exist.

Under Arizona law, subflow is underground river flow, and therefore part of the natural flow.[12] In *In re Rights to Use Water in Gila River System,* 857 P.2d 1236, 175 Ariz. 382 (1993), the Arizona court discussed extensively when subflow would be considered part of the river and they interpreted a prior holding that subflow was appropriable under A.R.S. § 45–141(A), which defines what waters are appropriable.[13] "Subflow

---

12. Because the compromise struck by the Decree was based in part on prior appropriation law as it was applied in Arizona at the time, it is proper that we consider Arizona law in defining the term "natural flow" as it is used in the Decree.

13. Ariz.Rev.Stat.Ann. § 45–141(A) reads:
 The waters of all sources, flowing in streams, canyons, ravines or other natural channels, or in definite underground channels, whether perennial or intermittent, flood, waste or sur-

'physically ... constitute[s] a part of the surface stream itself, and [is] simply incidental thereto.'" *Id.* at 1241, 175 Ariz. at 387, quoting *Maricopa County Municipal Water Conservation District No. One in Southwest Cotton Co.,* 39 Ariz. 65, 76, 4 P.2d 369, 380 (1931), *modified,* 7 P.2d 254, 39 Ariz. 367 (1932). Therefore, it appears that under Arizona law subflow in the river below the diversion dams would be part of the natural flow of the river.

If such is the case, then the real issue as regards the diversions dams is whether or not the UVDs so degraded water quality as to harm the Apache Tribe. However, this is a water quality issue, deferred by stipulation. The district court's opinion also indicates that its primary concern regarding the harm done to the Apache Tribe by the diversion was that it degraded the quality of the water. For instance, the court states that "testimony at trial unequivocally indicates that return flows are inferior and higher in salts." *Gila Valley Irrigation Dist.,* 804 F.Supp. at 7. This is testimony regarding water quality. The district court goes on to state that it will reconsider the order later if the UVDs prove that diversion of the entire flow can be done "without degrading the water to any greater extent than if some portion of it went undiverted." *Id.* This also indicates that the district court's chief concern was degradation of water quality. The UVDs were prevented from presenting evidence on water quality. Therefore, the district court abused its discretion in granting this "preliminary injunction".

Therefore, we vacate the district court's order in so far as it prevents the UVDs from diverting the entire flow of the stream. Because the ruling constitutes a preliminary injunction, and was based primarily upon issues regarding water quality, the UVDs were not given a fair opportunity to contest the ruling issued by the district court, due to the court approved and enforced stipulation. The district court can revisit this issue at the later trial, at which all parties will have a fair opportunity to present their respective cases, or even earlier if, in the district court's opinion, events warrant consideration of a preliminary injunction before then. In the latter case, the court must afford the parties the type of fair proceeding required before preliminary injunctions may be issued.

### III. CONCLUSION

The district court's order is AFFIRMED in all respects, except for its ruling regarding the UVDs diversion of the entire flow of the stream. That ruling is VACATED, as it is equivalent to a preliminary injunction, and the UVDs were not given an opportunity fairly to contest the ruling due to the stipulation to defer water quality issues. Costs on the appeal are awarded to the appellees.

---

plus water, and of lakes, ponds and springs on the surface, belong to the public and are subject to appropriation and beneficial use as provided in this chapter.